# PHINEAS PAM–TO–PEE *v.* UNITED STATES.

# POTTAWATOMIE INDIANS OF MICHIGAN AND INDIANA *v.* UNITED STATES.

## APPEALS FROM THE COURT OF CLAIMS.

Nos. 1125, 1133. Argued January 9, 10, 1893. — Decided April 17, 1893.

The decision of the Court of Claims respecting the amount of money to be awarded to the Indians in these cases is affirmed; and it is further suggested, as to the distribution of that amount among the several claimants that it is a question of law, to be settled by the court; but as the facts are not presented in an authoritative form, this court acquiesces in the suggestion of the court below that it be dealt with by the authorities of the government.

THE questions involved in this case grow out of the stipulations of certain treaties entered into between the United States and the Pottawatomie Indians within the period covered by the years 1795 to 1846, inclusive. In some of the treaties various tribes united with the Pottawatomies, but the tribes were recognized by the government as being distinct from one another, and their respective rights and duties under the treaties were therein defined and set forth. In others the Pottawatomie Indians were included in the tribe designated as the united nation of Chippewa, Ottawa and Pottawatomie Indians, but the government seems to have dealt with the united nation as though it were identical with the Pottawatomie tribe, and we shall so consider it in the present case. By the various treaties the Indians ceded lands to the government, and received for the same other lands, money, etc., and also pledges of specified annuities. By a treaty made on September 26, 1833, the said united nation ceded to the United States a tract of land on the western shore of Lake Michigan, containing 5,000,000 acres, and received as the consideration for the cession a reservation 5,000,000 acres in extent, west of the Mississippi River, various sums of money,

and the promise from the government of $280,000, to be paid in annuities of $14,000 a year for twenty years. It was provided by the treaty that a just proportion of the annuity money named therein, as well as a just proportion of the annuities stipulated for in the former treaties, should be paid west of the Mississippi to such portion of the nation as should have removed thither within three years, and that after the expiration of that time the whole amount of the annuities should be paid at the reservation west. On the day following the execution of that treaty an article supplementary thereto was made on behalf of the chiefs and head men of the nation, by which they ceded to the United States certain lands in the Territory of Michigan, south of the Grand River, containing about 164 sections. It was agreed that the Indians making this cession should be considered as parties to the treaty of the preceding day, and be entitled to participate in the benefits of the provisions therein contained, as part of the united nation. To the supplemental article another provision was added, as follows:

" On behalf of the chiefs and head men of the United Nation of Indians who signed the treaty to which these articles are supplementary, we hereby, in evidence of our concurrence therein, become parties thereto.

" And, as since the signing of the treaty a part of the band residing on the reservations in the Territory of Michigan have requested, on account of their religious creed, permission to remove to the northern part of the peninsula of Michigan, it is agreed that in case of such removal the just proportion of all annuities payable to them under former treaties and that arising from the sale of the reservation on which they now reside shall be paid to them at l'Arbre Croche."

Upon the basis of provisions contained in the various treaties, claims for unpaid annuities have been presented to Congress from time to time on behalf of Indians alleged to represent the part of the band mentioned in the last provision of the said supplemental article, and for the purpose, presumably, of having all questions connected with those claims finally settled, Congress passed an act, which was approved

March 19, 1890, 26 Stat. 24, c. 39, entitled "An act to ascertain the amount due the Pottawatomie Indians of Michigan and Indiana." The act is as follows :

"Whereas representatives of the Pottawatomie Indians of Michigan and Indiana, in behalf of all the Pottawatomie Indians of said States, make claim against the United States on account of various treaty provisions which, it is alleged, have not been complied with : Therefore,

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Court of Claims is hereby authorized to take jurisdiction of and try all questions of difference arising out of treaty stipulations with the said Pottawatomie Indians of Michigan and Indiana, and to render judgment thereon; power is hereby granted the said court to review the entire question of difference *de novo*, and it shall not be estopped by the joint resolution of Congress approved twenty-eighth July, eighteen hundred and sixty-six, entitled 'Joint resolution for the relief of certain Chippewa, Ottawa and Pottawatomie Indians,' nor by the receipt in full given by said Pottawatomies under the provisions of said resolution, nor shall said receipt be evidence of any fact except of payment of the amount of money mentioned in it; and the Attorney General is hereby directed to appear in behalf of the Government, and if the said court shall decide against the United States the Attorney General may, within thirty days from the rendition of the judgment, appeal the cause to the Supreme Court of the United States; and from any judgment that may be rendered the said Pottawatomie Indians may also appeal to said Supreme Court : *Provided,* That the appeal of said Pottawatomie Indians shall be taken within sixty days after the rendition of said judgment, and the said courts shall give such cause precedence.

"Sec. 2. That said action shall be commenced by a petition stating the facts on which said Pottawatomie Indians claim to recover, and the amount of their claims, and said petition may be verified by a member of any 'Business Committee' or authorized attorney of said Indians as to the existence of

such facts, and no other statements need be contained in said petition or verification."

On behalf of the Pottawatomie Indians of Michigan and Indiana, John Critcher filed a petition in the Court of Claims, April 14, 1890, averring that he was the authorized attorney of the said Indians, as, he stated, would appear by an agreement between himself and the business committee of the Indians, dated September 29, 1887, and claiming certain unpaid annuities under the said treaties. The claimants exhibited a table showing by periods of five years, from 1836 to 1872, inclusive, an enumeration of the Indians in Michigan and of those west of the Mississippi, from which it appeared that the average number of the former during that time was 291, and of the latter 2812. The petition contains a statement in detail of the various annuities claimed to be due, and asks for a judgment against the United States in the sum of $223,035.46, as being in the ratio of 291 to 2812 to the entire amount alleged to have been pledged to all the Pottawatomie Indians under the various treaties, plus the amount of $38,000, the sum of the annuities for nineteen years under the treaty of 1833. The latter sum was claimed on the assumption that the claimants should receive, of the annuities arising from the cession of their lands in southern Michigan, not a just proportion, but the whole amount. The claimants averred that the main tribe of Indians moved to their reservation west of the Mississippi, and that the part of the band which was to remove to the north did so remove in obedience to the terms of the provision supplementary to the treaty of 1833; that they are the representatives of that part of the band, and, as such, are entitled to all the benefits secured by the said supplemental provision.

On November 5, 1890, another petition was filed in the name of Phineas Pam-to-pee and 1371 other Pottawatomie Indians of Michigan and Indiana, by John B. Shipman, their attorney, alleging that they were entitled to share in the annuities secured to the Pottawatomie Indians by the said treaties; that they were not represented in the petition first filed, and that the attorney named in that petition had no

authority to act for them in the premises. This petition was filed on behalf of certain Indians, citizens of the United States, who were individually described by name and residence, alleged to be all the Pottawatomie Indians, so far as could be ascertained, resident in the said States, except not exceeding 250, from 91 of whom they alleged that the attorney named in the first petition derived his authority to act. The claimants stated, however, that their petition was intended for the benefit of all Indians included in the provisions of the act of Congress who might choose to take part in the proceedings in the said court. They averred that the Indians designated in the act, or their ancestors, were parties to all the said treaties, and entitled to share *per capita* in the annuities secured thereby to the Pottawatomies, and that the conditions imposed upon them by the treaties had been complied with. The claimants alleged that they were entitled to a just proportion of all the annuities provided for by the treaties in question. They interpreted the last provision of the treaty of 1833, as did the claimants in the first petition, to be that the Indians exempted from the requirement of removal west should receive the entirety of the annuity stipulated for in that provision. Under the treaty of 1833 they, therefore, claimed the sum of $38,000, being $2000 per year for the nineteen years the same remained unpaid. They also contended that the perpetual annuities provided for should be capitalized and the amounts thereof, in the sum of $446,000, added to the sum of the past unpaid determinate and perpetual annuities, namely, $2,021,200. Under a treaty made subsequently to 1833, to wit, on June 17, 1846, with the said Indians who emigrated west, the petitioners claimed that the Indians who remained in Michigan were entitled to the sum of $446,974.80. It is averred that by that treaty the said reservation west of the Mississippi was ceded to the United States by the said Indians, who were promised therefor, in addition to a perpetual annuity of $300, the sum of $850,000, less certain deductions provided for in the treaty; that after making such deductions, the balance remaining was $643,000, which was to be held by the government as a trust fund for

the Indians, and was to bear interest at 5 per cent, payable annually for thirty years, and until the nation should be reduced below one thousand souls; that the first instalment of interest became payable in 1849; that the total amount of interest up to and including the year 1890 was $1,350,300, and the value of the same as a capitalized annuity was $643,000, making an aggregate of $1,993,300. The petitioners averred that when the final provisions of the treaty of 1833 were executed, the number, as nearly as they could ascertain, of the Indians removing west of the Mississippi was 3840, and the number of those remaining in Michigan was 1110. They, therefore, alleged that the gross amounts stated, (with the exception of the said amount of $38,000,) should be apportioned between the Indians who removed west and those who remained in Michigan in the ratio of 3840 to 1110. They deduct from the total of the amounts ascertained as above the sum of $75,162.50, which they admit that the Indians remaining in Michigan received from the government under the treaties of July 29, 1829, and September 26, 1833, and under the act of Congress of July 28, 1866, leaving the sum of $963,058.50. This is the amount alleged to be due the Indians exempted from the requirement of removal west, upon the assumption that their number has remained the same as it was in 1833. The petitioners claimed to represent the Indians only who went north, whose number they alleged to have been the difference between 1110 and the number of those who remained in southern Michigan, and, therefore, the petitioners asked for a judgment for themselves in the sum of $804,383.80.

On January 8, 1891, the United States moved the Court of Claims to consolidate the cases, and on January 19, 1891, made a motion to dismiss the case presented by the last-named petition. The motions were reserved to be decided on the trial, and the court ordered that the cases be tried together. Upon the trial the motion to consolidate the cases was allowed, and the motion to dismiss the second case overruled. The court was of opinion that the purpose of the act of March 19, 1890, was to have all questions of difference arising from the

claims of the Pottawatomie Indians of Michigan and Indiana settled in an authoritative and judicial form, and that any proceeding which would accomplish that purpose, irrespective of technical rules of pleading, was proper under the act of Congress. It was further observed by the court that in each case it appeared that by special appointment the attorneys named in the petitions represented some of the Pottawatomie Indians who remained in the States of Michigan and Indiana, and that the essential requirements of the statute were thus fulfilled.

After due proceedings were had in the consolidated case, the Court of Claims, on March 28, 1892, 27 C. Cl. 403, found, in substance, the following facts: In obedience to the last provision of the article supplementary to the treaty of September 26, 1833, a few of the Pottawatomie Indians of Michigan and Indiana removed to the northern part of the peninsula of Michigan, but the great body of them remained in southern Michigan. To this failure to remove the government did not object, and did not force them to remove. Within the period from 1843 to 1866, inclusive, the Indians remaining in southern Michigan were there paid, by government agents, an aggregate amount of $75,162.50, $39,000 of which was the amount provided for by the joint resolution of Congress referred to in the act giving the Court of Claims jurisdiction in this case. The remaining amount, $36,162.50, was paid to the Indians as their proportion of annuities secured to them by the treaties of July 29, 1829, and the supplemental provision of the treaty of 1833. During the said period, as shown by a table in the office of the Second Auditor of the Treasury, the average number of Indians in southern Michigan was 253, and of those west of the Mississippi, 2834, and payments were made to the Indians in Michigan in this ratio. None of the Indians so paid permanently removed to the northern part of Michigan. During the period from 1836 to 1872, the average number of Indians in Michigan who remained under the treaty of 1833 was 291, and the average number west of the Mississippi was 2812. A number of other Indians residing on the reservation in Michigan in 1833 remained in the State of Michigan. Those Indians, and the 291

who stayed on account of their religious creed, numbered in all 1100. Many of the Indians who were in Michigan at the time the treaty of 1833 was made were dissatisfied with the requirement that they should emigrate west with the main tribe, and refused to go. It was necessary for the government to use force to compel them to leave, and in the struggle caused by this attempt to enforce the treaty many of the Indians, in evading the officers and agents of the government, scattered into different portions of the State, and many went to the northern portion. Those Indians did not come within the supplemental provisions of the said treaty, as construed by the agents of the United States. What their number was cannot be ascertained, but they outnumbered the Indians who remained by consent of the government as coming within the final provision of the treaty of 1833. The United States never made any tender to any Indians at l'Arbre Croche, nor in the northern part of Michigan. The agents of the government did not insist upon the removal of the Indians as a condition of their right of payment at any time.

Since 1835 the Pottawatomie Indians of Michigan and Indiana have received no payments of annuities provided for by the treaties of the following dates: August 3, 1795, 7 Stat. 49, Art. 4; September 30, 1809, 7 Stat. 113, Art. 3; October 2, 1818, 7 Stat. 185, Art. 3; August 29, 1821, 7 Stat. 218, Art. 4; September 20, 1828, 7 Stat. 317, Art. 2; October 20, 1832, 7 Stat. 378, Art. 3; October 26, 1832, 7 Stat. 394, Art. 3. Of the annuities promised by the treaties of October 16, 1826, 7 Stat. 295, Art. 3, and June 17, 1846, 9 Stat. 853, they have received no payments. The court also finds, specifically, that the said Indians have not been paid any money of an annuity of $2000 under the treaty of October 16, 1826, for the year 1848; nor of an annuity of $1000 under the treaty of September 20, 1828, for the year 1848; nor of an annuity of $15,000 under the treaty of October 20, 1832, for the years from 1843 to 1852, inclusive; nor of an annuity of $20,000 under the treaty of October 26, 1832, for the year 1852; nor of an annuity of $15,000 under the treaty of October 27, 1832, for the year 1844.

The claimants in both cases included in the list of treaties under which they requested the court to find annuities to be due them for the time subsequent to 1836, the last-named treaty, to wit, that of October 27, 1832, but the court made no finding with regard to payments made thereunder except as to the year 1844.

Upon the foregoing facts the court determined, as a conclusion of law, that the Pottawatomie Indians of Michigan and Indiana were entitled to recover the sum of $104,626, and gave judgment for the said Pottawatomie Indians in that amount. From that judgment the claimants in both petitions appealed to this court.

*Mr. John B. Shipman* for Phineas Pam-to-pee and others, appellants in No. 1125.

*Mr. John Critcher* and *Mr. George S. Boutwell* for the Pottawatomie Indians of Michigan and Indiana, appellants in No. 1133.

*Mr. Assistant Attorney General Parker* for appellees.

MR. JUSTICE SHIRAS delivered the opinion of the court.

The act of March 19, 1890, entitled " An act to ascertain the amount due the Pottawatomie Indians of Michigan and Indiana," conferred jurisdiction upon the Court of Claims to " try all questions of difference arising out of treaty stipulations with the said Pottawatomie Indians of Michigan and Indiana, and to render judgment thereon." The act granted power to said court to " review the entire question of difference *de novo*," and provided for an appeal to this court by either party.

In pursuance of the provisions of this statute, on the 14th of April, 1890, a petition was filed in the Court of Claims by the Pottawatomie Indians, by their agent and attorney, John Critcher, and on the 5th of November, 1890, another petition by the Pottawatomie Indians, by their agent and attorney, John B. Shipman.

The United States objected to the filing of two petitions,

and the court below, overruling a motion to dismiss the later petition, consolidated the causes, and dealt with them as one. The two classes of claimants unite in the appeal to this court.

They agree in complaining of the insufficiency of the sum allowed the Indians by the decree of the court below, but they disagree, as between themselves, in respect to the division of the moneys awarded by the decree. The Indians represented by John Critcher claim the entire fund; those represented by John B. Shipman claim a right to participate in the fund, and claim, likewise, as we understand them, that only 91 Indians are really represented in the first petition. We shall first consider the merits of the appeal as against the United States, and afterwards deal with the question of distribution.

The first controverted question is as to whom is due the annuity of $2000 for twenty years, granted by the last clause of the supplemental treaty of September 27, 1833. The petitioners claim the entire amount, $38,000. The United States contend that this amount is distributable between the Indians who went west under the provisions of the treaty of September 26, 1833, and those who remained in Michigan under the supplemental treaty of September 27, in proportion to their respective numbers.

To answer this question, we must resort to the language of the treaties. The 4th article of the treaty of September 26, 1833, is as follows:

"A just proportion of the annuity money, secured as well by former treaties as the present, shall be paid west of the Mississippi to such portion of the nation as shall have removed thither during the ensuing three years. After which time the whole amount of the annuities shall be paid at their location west of the Mississippi." 7 Stat. 431.

The articles supplementary, of September 27, provided as follows, 7 Stat. 442:

"Article 1st. The said chiefs and head-men cede to the United States all their land situate in the Territory of Michigan south of Grand River, being the reservation at Notawa-

sepe, of 4 miles square, contained in the 3d clause of the 2d article of the treaty made at Chicago on the 29th day of August, 1821; and the ninety-nine sections of land contained in the treaty made at St. Joseph on the 19th day of Sept., 1827; and also the tract of land on St. Joseph River opposite the town of Niles, and extending to the line of the State of Indiana, on which the villages of To-pe-ne-bee and Pokagon are situated, supposed to contain about 49 sections.

· "Article 2d. In consideration of the above cession it is hereby agreed that the said chiefs and head-men and their immediate tribes shall be considered as parties to the said treaty to which this is supplementary, and be entitled to participate in all the provisions therein contained as a part of the United Nation; and further, that there shall be paid by the United States the sum of one hundred thousand dollars, to be applied as follows:" (Here follows a specific disposition of $60,000 of it.)

And then this is added:

"And forty thousand dollars to be paid in annuities of two thousand dollars a year for twenty years, in addition to the two hundred and eighty thousand dollars inserted in the treaty, and divided into payments of fourteen thousand dollars a year.

· "Article 3d. All the Indians residing on the said reservations in Michigan shall remove therefrom within three years from this date, during which time they shall not be disturbed in their possession, nor in hunting upon the lands as heretofore. In the meantime no interruption shall be offered to the survey and sale of the same by the United States. In case, however, the said Indians shall sooner remove the government may take immediate possession thereof."

On page 445 appears the following, signed by eight Indians but not signed by the commissioners:

"On behalf of the Chiefs and Head-men or the United Nation of Indians who signed the treaty to which these articles are supplementary, we hereby, in evidence of our concurrence therein, become parties thereto.

"And as since signing of the treaty a part of the band

residing on the reservations in the Territory of Michigan have requested, on account of their religious creed, permission to remove to the northern part of the peninsula of Michigan, it is agreed that in case of such removal the just proportion of all annuities payable to them under former treaties, and that arising from the sale of the reservation on which they now reside shall be paid to them at l'Arbre Croche."

The court below held, with the United States, that under these provisions these claimants were entitled, not to the whole, but to "a just proportion" of this annuity provided for in the supplemental articles of September 27, 1833; and in this view we concur.

It was admitted that the one year's annuity, $2000, had been paid, leaving to be paid $38,000, of which amount the court awarded in favor of the claimants, as "a just proportion thereof," the sum of $3653.60. The court arrived at this particular sum by taking the number of the Indians who went west at 2812 and the number of those who were permitted to remain east as 291.

It is claimed that the court below erred in this method of computation, because it gives an interest to Indians who were not entitled, under the supplemental treaty of September 27, 1833, to participate in this fund. An examination of that treaty shows that the annuity of $2000 for twenty years was in part consideration of the cession by the Indians who took part in it of 49 sections of reservations on which they were then settled; and it is claimed with considerable force that the proceeds of the sale of such reservations, so far as this annuity was concerned, should be distributed among the Indians on whose behalf the supplemental treaty was made, to the exclusion of those who had made the treaty of the day before.

However, we think the court below was right in refusing to adopt this view of the case, and in regarding the two treaties as substantially one, and that, therefore, this annuity was distributable among both classes, giving to those who were permitted to remain east "a just proportion thereof."

The conclusion arrived at by the court below, in its 8th

finding, was that, under the several treaties and upon the entire account, there had accrued to the entire tribe, those who had gone west and those who had remained in Michigan and Indiana, the sum of $1,432,800; that the portion of this that belonged to the petitioners was $134,368.26. To this is to be added the proportion awarded the petitioner of the $2000 annuity under the supplemental treaty of September 27, 1833, being, as we have already seen, $3653.60. The court below further awarded the petitioners, as their proportionate share of the money due and unpaid of the perpetual annuities under the treaties of September 26 and 27, 1833, the sum of $41,626. As against these sums the court below charged the petitioners with the sum of $75,162.50, which amount it is admitted has been received. The court below was urged to decree that the perpetual annuities under said treaties should be reduced to a cash basis, as of the present time, and be now paid. Such a disposition of these annuities would be a very convenient one, and all the claims of the petitioners would thereby be finally closed. But the court properly held that no power had been given it to convert the perpetual annuities into a sum for present payment; and that matter must be left to be hereafter dealt with by Congress.

As the United States took no appeal, the several contentions on their behalf are not before us for consideration.

Accepting, as we must do, the facts of the case as found by the court below, we perceive no error in its decree establishing the sum due to the petitioners.

How the moneys so awarded shall be distributed among the several claimants it is not easy for us to say. The findings of the court below, and the contradictory statements of the several briefs filed by the appellants, have left this part of this subject in a very confused condition. The court says:

"The second section provides that said action shall be commenced by petition, stating the facts, and that the same may be verified by a 'Business Committee,' or authorized attorney of said Indians. Each of the petitions in this proceeding is verified by the affidavit of the attorney appearing in each case, and in that particular are identical. In each

case it appears that by special appointment the attorneys represent some of the Pottawatomies who remained in the States of Indiana and Michigan, under the supplementary article to the treaty of September 27, 1833. In this view of the statute the court allows the motion of the defendants to consolidate the cases, made on the 8th day of January, 1891, and overrules the motion to dismiss cause No. 16,842, made on the 19th of January, 1891.

" This brings the issue by both petitioners to the consideration of the court, to be disposed of upon one broad ground of the right of all the Pottawatomies of Michigan and Indiana. Congress have recognized by the very title of the act a claimant designated as the ' Pottawatomie Indians of Michigan and Indiana,' and under that generic head is to be determined the aggregate right of such claimant, leaving the question of distribution to that department of the government, which by law has incumbent on it the administration of the trust which in legal contemplation exists between the United States and the different tribes of Indians."

On the other hand, it is contended, with great show of reason, by the petitioners who are represented in case No. 1125, (16,842 in the court below,) that the question of what Indians are entitled to participate in the fund is one of law, to be settled by the court, and should not be left to clerical functionaries. Our difficulty, in disposing of this part of the subject, is that we have neither findings nor concessions that enable us to deal with it intelligently.

It is to be observed that the court below found, as a fact, (see finding 10,) that the average proportion between the Indians who removed west and those who remained was as 2812 of the former to 291 of the latter, and the court used that relative proportion of numbers as a factor in computing the amount due the petitioners.

The petitioners, however, number 1371 in case No. 1125, but the number represented in No. 1133 (16,473 in the court below) is not precisely stated. It is alleged in the brief filed in behalf of petitioners in case No. 1125 that only 91 Indians are actually represented in case No. 1133, and that

the other 200 Indians are among those represented in case No. 1125.

But these facts are not found for us in any authoritative form. Nor, indeed, would it seem that the court below was furnished with information sufficient to enable it to define what Indians or what number of Indians, entitled to distribution, are represented by the respective attorneys or agents.

Unable as we are to safely adjudicate this question as between these classes of claimants, we can do no better than acquiesce in the suggestion of the court below, that it is one to be dealt with by the authorities of the government when they come to distribute the fund.

As these petitioners no longer have any tribal organization, and as the statutes direct a division, of the annuities and other sums payable, by the head, and as such has been the practice of the government, perhaps the necessities of the situation demand that the identification of each claimant entitled to share in the distribution shall be left to the officers who are the agents of the government in paying out the fund. *United States* v. *Old Settlers, ante,* 427.

The decree of the court below is                              *Affirmed.*