Nott, Ch. J.,
delivered the opinion of the court:
When the former cases were before the court (27 C. Cls. R., 403), in which the present claimants were represented, it was' found as a fact (ib., p. 408) that the number of Pottawatomie Indians who remained in Michigan under the treaty of 1833 was 291, and the number who removed to the West was 2,812; and it was held that the just proportion of those who remained in Michigan, in certain tribal funds, would amount, June 30, 1892, to §17,630.67. To this “just proportion,” §17,630.67, was added balances of annuities and other funds, bringing up the amount for which judgment was rendered to §104,626.
It is unfortunate for some of the claimants in the present suit that the evidence upon which they now rely was not before the court then. In the former cases the parties who were represented by the suit of the Pottawatomies v. United States took the ground that they were Indians and descendants of Indians in Michigan who had been recognized by the administrative branch of the Government as being entitled to remain *456 in Michigan under the supplemental article of the treaty of 1833. The parties represented by the suit of Pam-to-pee et al. v. United States contended that the others had neither complied with the terms of the treaty by moving to the West, nor with the supplemental article of the treaty by moving to the North; and they stood, accordingly, upon the ground that they, who had complied with the supplemental article, were the only Indians entitled to participate in the tribal funds. The court deemed itself bound by the action of the Government in recognizing the parties represented oy the former suit, and accordingly rendered judgment for them; but the court did not undertake to determine who the then existing individual claimants were who were entitled to participate in the distribution.
To ascertain the proportional amount of the common fund which should be distributed, the court resorted to the first rolls which had been made by the Indian Office after the treaty of 1833, viz, those of 1843-44, and to a summary of the roll of 1866.
The present claimants accept the judicially determined facts of the former controversy as incontrovertible, but they allege and endeavor to prove that they are Indians or descendants of Indians who were upon the rolls of 1843 and 1844, and that they have not been paid.
It now appears that, the ascertained fund — the judgment— was paid to only 272 Indians, a number slightly less than the number of Indians existing in 1833; and this diminished number is striking because the fund was distributed as .communal property — that is to say, both parents and children took per capita as members of the community. If it had been an ordinary case of distribution according to common-law rules, there would be, say, two grand parents living, who alone would be entitled to be paid. But in a case of communal property there would be two grand parents, and, say, four parents, and, say, sixteen grandchildren, a total of twenty-two persons, all equally entitled to share in the fund. The claimants in the present suit bring the number of descendants up to 544 persons.
The gravamen of the plaintiff’s case is this: The Secretary of the Interior directed that a census, so called, be made of *457 Indians entitled to participate in the judgment. On tbe 27th of July, 1895, the agent of the Department being still in the field and engaged in the work, the claimant’s attorney addressed a letter to the Secretary of the Interior calling his attention to the fact that the agent had taken as a basis of investigation a roll of the Michigan Indians made in 1866, and had excluded from consideration the rolls of 1843 and 1844; and he pointed out in his communication that this proceeding would work great injustice to persons or descendants of persons who had died between 1843 and 1866; and he insisted that the census should omit no one whose name was on those rolls which had been before the court. The Secretary of the Interior, on the 10th of January, 1896, after due consideration of the matter, decided that those should be enrolled who make satisfactory proof “that they were on one of the rolls taken in the years 1843 to 1866 inclusive, or are descended from some one on one of those rolls.”
To this the claimants’ counsel did not object; he had, indeed, suggested in his communication of the 27th of July, 1895, that that was the proper course to be pursued. But he insists that this was not done; that the order to do so, as well as the decision of this court, was ignored; that no attention was paid to the list containing the names of Indians entitled to share in the judgment fund; that no other census than Cadman’s census roll was ever made or attempted to be made.
The evidence does not altogether sustain the claimants’ case. It appears, on the contrary, that the agent endeavored to carry out his instructions. His report to the Commissioner of Indian Affairs, March 14,1896, shows that he traveled through the country where these Indians resided, or were supposed to reside, and notified them, so far as he could, to appear and prove their cases. In his report he said:
“I found these people very badly scattered, and as they do not frequent post-offices, the notices prepared for me to be posted in the various post-offices, to give them notice of my coming, were of but little value. In nearly every instance, on reaching the vicinity of these Indians, I had to take teams and drive to their homes. I got, however, the newspapers to publish the principal points I would visit.”
A number appeared, some of whom claimed because their ancestors’ names were on the rolls of 1843 and 1844, others because they had Pottawatomie blood in their veins. All of *458 these applicants were rejected for various reasons; some because their proof was insufficient; some because they or their forefathers had allied themselves with other Indian tribes; some because their fathers’ names had been erroneously placed, in the opinion of Indian agents, upon the former rolls, and had been dropped from subsequent rolls. The investigation was hurried, and to the judicial mind is unsatisfactory, yet it can not be said that the agent disregarded the rolls of 1843 and 1844. The evidence produced -was to his mind insufficient and unsatisfactory to prove that the forefathers of those applicants had rightfully been placed upon the rolls. The evidence now produced to establish the fact that 272 of the present claimants are direct descendants of the Indians who were upon the rolls in 1843 and 1844 is not altogether satisfactory to the court, but in the absence of countervailing testimony it may be said to present a prima facie case.
If we turn to the legal record in the case the following facts appear:
The judgment which was recovered in this court on the 27th June, 1892, is in these words:
“The court, on due consideration of'the premises, find for the claimants and do order, adjudge, and decree that the said Pottowatomie Indians do have and recover of and from the United States the sum of one hundred and four thousand six hundred and twenty-six dollars.”
No decree was entered designating the individuals among whom the fund was to be distributed or directing the manner of distribution or the officer who was to make the distribution, such as were entered in former cases of Indian claimants. (Western Cherokees v. United States, 27 C. Cls. R., 1, 61; Journeycake v. United States, 28 ib., 281, 319; Whitmire v. Cherokee Nation et al., 30 ib., 138, 177; decree entered March 18, 1895.)
The judgment above set forth in the case of the Pottawatomie Indians was appealed from bjr the claimants in the case of Pam-to-pee v. United States, but not by the United States (148 U. S. R., 691), and was affirmed. The Supreme Court in its opinion said that it is contended with a great show of reason by the appellants—
“That the question of what Indians are entitled to participate in the fund is one of law, to be settled by the court, and *459 should not be left to clerical functionaries. Our difficulty in disposing of this part of the subject is that we have neither findings nor concessions that enable us to deal with it intelligently.” (Ib.,704.)
In regard to the individual Indians entitled to recover, the Supreme Court also said:
“But these facts are not found for us in any authoritative form. Nor, indeed, would it seem that the court below was furnished with information sufficient to enable it to define what Indians or what number of Indians entitled to distribution are represented by the respective attorneys or agents. ”
At this point, if the former case had been a similar suit in chancery between ordinary litigants, it would have been referred to a master or referee to ascertain and report as to the individuai claimants entitled to recover, and the final decree would not have been entered until a coming in and confirmation or correction of the master’s report. The Secretary of the Interior, however, seems to have inferred fromlanguage in the opinions of the two courts that he was authorized to proceed and ascertain who those Indians were, and to prescribe the methods for so ascertaining and determining the amount to be distributed to each individual claimant. He apparently requested an appropriation from Congress to meet the expenses of the investigation; and Congress, by the Act %d Ma/rch, 1895 (28 Stat. L., 894), enacted:
“That the Secretary of the Interior is hereby authorized and directed to detail or employ an Indian inspector to take a census of the Pottowatomie Indians of Indiana and Michigan who are entitled to a certain sum of money appropriated by Congress to satisfy a judgment of the Court of Claims in favor of said Indians. And for the purpose of making the payment to the Pottowatomie Indians of Indiana and Michigan of the one hundred and four thousand six hundred and twenty-six dollars, appropriated by the last Congress to satisfy a judgment of the Court of Claims, there is hereby appropriated the sum of one thousand dollars.”
The appropriation above referred to, for the satisfaction of the judgment of this court, is in the sundry civil appropriation act, August 23, 1894 (28 Stat. L., 424, 450), and is in these words:
“For payment of judgments of the Court of Claims, as follows:
“To the Pottawatomie Indians of Michigan and Indiana, one hundred and four thousand and twenty-six dollars.”
*460 The Secretary of the Interior then appointed an agent to ascertain the names and number of the claimants entitled to be paid, and prescribed the means and methods for ascertaining them and the principles upon which the fund should be distributed, and the whole of the fund was paid away. Nevertheless, there is not a line in the judgment of this court or in any statute of Congress which empowered or authorized the ' Secretary to dispose of the fund.
These facts present a delicate if not difficult question. The counsel for the defendants has taken the broad ground that the Government can not be made to pay a second time; and if this were an ordinary case of the kind, the array of well-chosen authorities which he has presented would be overwhelming. But there is no case or authority cited which exactly meets the conditions of the present case. The defendants were not administrators, executors, or trustees paying -involuntaria under the imperative order of a court; no court could have committed them for contempt if they had refused to pay, and their official representative, the Secretary of the Interior, was not without notice that there were claimants seeking to participate in the fund who also claimed to be within the letter and spirit of the court’s decision. '
The authorities cited by the counsel may be resolved into two general classes: One where an officer, such as an administrator or executor, pays away a fund under the coercion of a decree or order of a court having jurisdiction of the fund; the other, where an innocent stakeholder, without fault, negligence, or mistake, pays away a fund to the injury of a negligent party who fails to present his claim in due time. Apart from these authorities there is the great principle of equitable estoppel, that where a man remains silent when he ought to speak he can not be permitted to speak when it will be to the injury of another person who was misled by his silence. In this case the claimants knew, or could have known, that the census made by an agent of the Interior Department was returned and filed in August, 1895, and that the final decision of the Secretary of the Interior was made in Januaiy, 1896. So far the case seems clear. The resulting question is, W ere the claimants bound to ascertain between that time and the *461 payment of the fund during the month of November, 1896, that their names were on the pay roll, or might they assume that the direction of the Secretary would be correctly carried out by his subordinates?
The court has reluctantly come to the conclusion that that burden rested upon the claimants. The documentary proceedings in the Interior Department were not completed when the order of the Secretary was made. His decision was his direction that a new pay roll be made, and the circumstances required vigilance on the part of persons, whose right to be there had not yet been determined by name, to see that their names were duly placed upon the final pay roll. It is the misfortune of these claimants that they did not do so.
The counsel for the claimants has cited the practice of courts of equity, and particularly the English courts, in requiring notice to be published in case of multitudinous defendants requiring them to come in and assert their rights. But such notices are not given for the benefit of persons who have appeared in and have actual knowledge of a suit. These Indians were dwelling in a not very wide extent of territory; the subject of litigation was something of more than common interest to every one of them. Assuredly the act of Congress of March 19,1890 (2.6 Stat. L., 24), authorizing them to bring suit in this court to determine their rights, the bringing of two suits by contesting claimants, the trial of the cases, the decision of this court, the appeal to the Supreme Court, the decision of the Supreme Court, the appropriation by Congress for the payment of the judgment, the act of Congress authorizing a census to be made, and the taking of the census by an agent of the Interior Department, were more than equivalent to the publishing of a notice in the newspapers.
The counsel for the claimants has urged with great earnestness that these parties for whom he appears are simple, friendless, and unlettered men, women, and children, knowing little of their own rights and utterly ignorant of legal pi’oceedings. And that is true. But the former case, in which the court might have exercised the discretion of a court of equity and allowed parties to come in even after the decree and .assert their rights, is closed; the judgment therein has been satisfied; the claimants stand directly upon their legal rights, and there *462 can not be one law for the intelligent and another for the ignorant.
The judgment of the court is that the petition be dismissed.