Ho why, J.,
delivered the opinion of the court:
Petitioners, who are said to number 1,200, are persons of color otherwise known as “ freedmen ” and claiming rights under a treaty proclaimed August 11, 1866 (14 Stat., 799), between the Cherokee Nation and the United States. By an act approved October 1,1890 (26 Stat., 636), full jurisdiction was conferred upon this court, subject to appeal,
“to hear and-determine the just rights in law or in equity of * * * the Cherokee freedmen, who are settled and located in the Cherokee Nation under the provisions and stipulations of article 9 of the aforesaid treaty of 1866, in respect to the subject-matter herein provided for.”
By section 2 the subject-matter was
“ to recover from the Cherokee Nation all moneys due either in law or equity and unpaid to the * * * freedmen, which the Cherokee Nation have before paid out, or may hereafter pay, per capita, in the Cherokee Nation, and which was, or may be, refused to or neglected to be paid to the said * * * freedmen by the Cherokee Nation, .out of any money or funds which have been, or may be, paid into the Treasury of, or in any way have come, or may *458 come, into the possession of the Cherokee Nation, Ind. T., derived from the sale, leasing, or rent for grazing purposes on Cherokee lands, west of 96°, west longitude, and which have been, or may be, appropriated and directed to be paid out per capita by the acts passed by the Cherokee council, and for all moneys, lands, and rights which shall appear to be due to the said * * * freedmen under the provisions of the aforesaid articles of the treaty and articles of agreement.”
As in the jurisdictional act provided Whitmire, as trustee, brought suit on behalf of said freedmen, alleging that certain trust funds were about to be paid to members of the Cherokee Nation per capita to the exclusion of the freedmen and praying for payment to them of their proportionate interest in the common property. After the filing of this petition the United States bought from the Cherokee Nation what was known as the Cherokee Outlet, paying therefor the sum of $8,595,736. Thereupon an amended petition was filed by the freedmen through their trustee in the same cause averring this sale and praying for a decree securing to them full participation in this fund likewise. On these proceedings it was decreed, among other things, that the freedmen and free colored persons and their descendants living and in being on May 3, 1894, were
“ entitled to' participate hereafter in the common property of the Cherokee Nation in the same manner and to the same extent as Cherokee citizens of Cherokee blood or parentage may be entitled, and that in the distribution of the proceeds and avails of the public domain or common property of the nation among the citizens thereof by distribution per capita at any time hereafter the defendant, the Cherokee Nation, and the -defendant, the United States, as trustees of the Cherokee Nation, be enjoined and prohibited from making any discrimination between the Cherokee citizens who are or were freedmen who had been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the Cherokee country at the commencement of the rebellion and were residents therein at the date of said treaty, or should return thereto within six months thereafter, and their descendants, to the prejudice 'of the latter. It being understood that the freedmen and their descendants and free colored persons referred to shall include only such persons of said class as have not forfeitecj or abjured their citizenship of said Cherokee Nation- at the *459 date of the entering of this decree, * * * and it is further ordered and adjudged that for tlie purpose of ascertaining and determining who are the individual freedmen of the Cherokee Nation now entitled to share in the distribution of the said sum of $903,365, the Secretary of the Interior be authorized to appoint three commissioners,” as therein provided, “ and that the said commissioners in ascertaining the identity of the freedmen entitled to share under this decree shall accept what is known as the authenticated roll, the same now being on file in the office of the Secretary of the Interior, having been furnished to him and purporting to have been taken by ‘the Cherokee Nation in 1880 for the purpose of ascertaining the number of freedmen then entitled to citizenship in the said nation under the terms of the treaty between the United States and the Cherokee Nation; * * * and the said commissioners shall ascertain who of said persons named in said roll were alive and what descendants of said persons were alive on May 3, 1894, and no evidence shall be accepted by said commissioners tending to disprove the citizenship of any of the persons whose names appear upon said roll.” (30 C. Cls. E.., 138; 30 ib., 180.)
The instructions of the Secretary of the. Interior to the commissioners by him appointed to make said roll provided, among other things, that said commissioners were to accept what is known as the “ authenticated Cherokee roll,” purported to have been taken by the Cherokee Nation in 1880, and to make no inquiry respecting it other than to ascertain who of said persons were alive on May 3, 1894. In the instructions it was further recited, in substance, that the authenticated Cherokee roll referred to in the decree was not on file, and the only copy known to be on file that could be taken for said authenticated Cherokee roll ivas a certified copy of said roll furnished to J. W. Wallace by the Cherokee authorities when he ivas in the Cherokee Nation making up his census of Cherokee freedmen living and in being March 3, 1883. This roll, copy of which was furnished, was said by the Secretary to contain the names of 1,874 persons, while the decree of the court fixed the number, in 1880, of Cherokee freedmen at 2,052. The Secretary’s instructions, follow•'ing the decree, prohibited the commissioners from accepting evidence tending to disprove the citizenship of anj7 of the persons whose names appeared upon the Cherokee roll *460 ■aforesaid. After the entering of said decree commissioners were appointed and a roll was made of said freedmen in compliance with the terms of the decree, and the freedmen’s proportionate interest in the proceeds of the sale of the Cherokee Outlet was distributed to them according to the roll prepared under the decree of the court through the Secretary of the Interior. This roll then became known as the Kern-Clifton roll.
By section 21 of an act known as the “ Curtis Act,” approved June 28, 1898 (30 Stat., 495), the Dawes Commission theretofore created were directed, in making a roll of citizenship of the Five Civilized Tribes, to take the roll of Cherokee citizens of 1880 — not including freedmen — as a basis, which was done; and respecting the roll of freedmen that section provided that “ it shall make a roll of Cherokee freedmen in strict compliance with the decree of the Court of Claims rendered the 3d day of February, 1896.”
Thereafter, by the act of July 1,1902 (32 Stat., 116), Congress made provision for the allotment of Cherokee lands to all Cherokee citizens living on September 1, 1902; and made provision in sections 25 and 26 as to the class of persons to be enrolled and those who should not be enrolled; and by section 27 provided that “ such rolls shall in all other respects be made in strict compliance with the provisions of section 21 of the act of Congress approved June 28, 1898 ” (supra). Thereupon said commission proceeded to make up rolls of citizens of the Cherokee Nation, but in doing so excluded from said rolls a large number of freedmen who had been enrolled under the decree of this court of February 3, 1896.
At the time of the passage of the last act' the Cherokee Nation owned about four and a half million acres of land in the Indian Territory, and there was to the credit of the nation in the Treasury of the United States $2,900,000, to which fund large sums have since been added.
Petitioners allege that in the allotments and distributions made or now about to be made by the Secretary of the Interior they are and will be excluded from allotments in the lands and from participation in the assets and funds of the Cherokee Nation in disregard of the acts of June 28, 1898, and July 1, 1902 (ante), and in violation of the injunction *461 contained in the decree of this court which prohibited the defendants from making any discrimination between the Cherokee citizens of Cherokee blood or parentage and Cherokee citizens who are or were freedmen.
The object of the present proceeding is to obtain the order of the court to appoint a trustee in the place of Moses Whit-mire, who is now deceased, and to permit such substituted trustee to file and prosecute the supplemental petition herein to prevent the discrimination charged.
Notice having been given, the court has taken jurisdiction far enough to appoint a substituted trustee. Defendants now come and say that those claimants for citizenship in the Cherokee Nation whose applications have been denied by the Secretary of the Interior under the acts mentioned have not been allotted land in the Cherokee Nation, but that such claimants were, prior to the rejection of their applications for enrollment, permitted to make tentative allotment selections so as to protect their homes and interests pending the final determination of their right to enrollment, and that after the final rejection of their applications their tentative allotment selections were canceled. The substance of the specific defense is “ the probability that most, if not all, of the land held by freedmen claimants who have been rejected by the Secretary of the Interior has been allotted ” to others. Notwithstanding which rejection, the Secretary of the Interior has not removed from land any freedmen claimants whose claim for citizenship was pending, nor has any action been taken to place other allottees in possession of land now being held by persons claiming freedmen citizenship whose enrollment has been denied. It will thus be seen that there are some persons in possession of land whom defendants have not ousted, but they are persons who claim to be freedmen under the ninth article of the treaty of 1866, whose rights, it is contended, were fixed by the decree of February 3, 1896. For the purposes of this case, then, it appears, in fact is conceded, that a considerable number of the petitioners are freedmen in possession of land who claim that their rights have been fixed by law as Cherokee citizens, and that they are entitled to participate in the allotment of lands and in the distribution of funds of the Cherokee *462 Nation notwithstanding they have been excluded from the Dawes rolls. Many of these persons are still there, awaiting the action of the court to enforce its decree, which made what is known as the Kern-Clifton roll the basis for the enrollment of petitioners.
The right of the petitioners to invoke the jurisdiction of the court is by the dofendánts denied because, (1) it is contended that when the money provided by the decree to be paid was actually distributed the power of the court over the subject-matter became exhausted, and (2) it is further contended that the duties of the Secretary of the Interior in approving all the rolls, and especially the duties exercised by him in approving the later roll by Avhich petitioners are excluded became judicial in character by the terms of the decree, the Cherokee constitution, and the act of July 1, 1902. These objections to jurisdiction will be considered together. But in passing it should be noted that if either of these propositions be sound then it is apparent that an extraordinary mistake was lhade in the distribution of the very largo sum of money which was paid'as the result of the action of the commissioners who made up what is known as the Kern-Clifton roll and the administrative approval of that roll by the Secretary of the Interior.
That the decree which operated to make distribution of the money heretofore distributed to these petitioners is not final and that its office has not been fully performed seems to be clear from the provisions of the act under which the decree was rendered. That act directed the court to take full jurisdiction to hear and determine what the just rights of the freedmen settled and located in the Cherokee Nation under the stipulations of the treaty of 1866 were. The subject-matter to be included in any recovery embraced—
“ all moneys due either in- law or equity and unpaid to the * * * freedmen which the Cherokee Nation have before paid out, or money hereafter paid per capita, in the Cherokee Nation, and which was, or may be, refused to or neglected to be paid to the * * * freedmen by the Cherokee Nation, * * * and for all moneys, lands, and rights which shall appear to be due to the said * * * freedmen under the provisions of the aforesaid articles of the treaty.”
*463 The court undertook by this decree of February 3, 1896, to fix the rights of the parties by declaring that the freedmen had perpetual rights in the ownership of the common property of the Cherokee Nation. The common property embraced land as well as a fund derived from a sale of a part of the land to which they were entitled as well as an interest in funds likewise to accrue. Defendant Cherokees admitted the political rights of the freedmen, but denied their rights to any property. There was a general purpose determined by the decree and an immediate subject-matter to be disposed of in the distribution of the proceeds of the sale of a part of the property which the decree declared the freedmen entitled to possess. It was “ not an action to recover damages in the nature of a suit at law, nor a proceeding in equity to wind up and dispose of the affairs and assets of a partnership. Simply a suit in equity brought by the equitable owners ” to recover a proportionate share in the specific fund in hand at the time of the decree, as well as to fix the rights of the petitioners in the other property of the Cherokee Nation to which all its citizens were entitled. The decree expressly enjoined and prohibited the defendants from making any discrimination between citizens of blood or parentage and citizens who are or were freedmen who had been liberated by voluntary act of their former owners or by law, as well as of free colored persons who were in the Cherokee country and were residents therein at the date of the treaty or who returned thereto rvithin six months thereafter, and their descendants. The court did not consider its decree as final, because the decree was concluded Avith the language that “ the court reserves the right to make all such further orders in aid hereof as to it may seem meet.”
Having acquired jurisdiction we think it is a sound proposition to say that the decree of the court sitting in equity can not be regarded as a final decree while there remains anything material to be done touching the parties or the subject-matter of the controversy.
If any of the persons declared by the decree to be entitled to participate in the common property are now denied, so that a part of the funds now to be distributed will not reach the persons who have been adjudicated to be entitled to *464 share, the court has jurisdiction to ascertain the reasons why there has been a denial of their right so as to participate. In Pam-to-pee v. United States (36 C. Cls. E., 427; 187 U. S., 371) it was declared in general terms by the Supreme Court in affirming this court that—
“ the jurisdiction of a court is not exhausted by the mere entry of a judgment. It always has power to inquire whether that judgment has been executed, and the contention here is — and it is the basis of this suit — that the judgment which was rendered in the prior suit has not been executed. It would be an anomaly to hold that a court having jurisdiction of a controversy and which renders a judgment in favor of A against B has no power to inquire whether that judgment has been rightfully executed by a payment from B to C.”
Not only did this court understand that the act gave jurisdiction to fix the general interests of the freedmen in the common property as citizens and to identify the individuals entitled to share whenever lands came to be allotted or funds to be distributed, but the defendants likewise understood the act to mean the same thing. The issues were actively litigated. But there was no appeal. "When the court undertook the duty of identifying the individuals entitled to share in everything that was to be allotted or distributed the defendants made no objections and acquiesced in the terms of the decree for the distribution of all communal property. There is nothing in the language of the decree to obscure this interpretation of its terms and to prevent inquiry into the question whether in the distribution of the property jurisdiction was not to be exercised to prevent discriminations to the end.
In carrying out the decree the Secretary of the Interior did not exercise judicial powers. Nor does the court understand from the returns of the Interior Department that the Secretary himself ever claimed that the court delegated its judicial power either to the Secretary or to the commission acting under the instructions of the Secretary. The record shows that the court did decree a class of freedmen and free colored persons entitled to share and provided a method for the ascertainment of the individuals in the class named who *465 were entitled to Cherokee citizenship. That the Secretary understood his duty to be entirely ministerial affirmatively appears by the inquiry presented to the court from the Indian Office respecting the interpretation to be given to the decree. The Secretary’s duties being merely ministerial, the remedy was properly in the form of an application to the court already having jurisdiction.
It is further objected to this proceeding that Congress has plenary power to prescribe the method of making the rolls of citizenship of the Cherokee Nation, and can change the method prescribed at any time before final allotments of land are made, and that Congress intended that a. new roll of freedmen citizens of the Cherokee Nation should be made under the supervision of the Secretary of the Interior.
In the original case of Pam-to-pee v. United, States (148 U. S., 691), the Supreme Court said that it was contended with a great show of reason “ that the question of what Indians are entitled to participate in the fund is one of law, to be settled by the court, and should not be left to clerical functionaries.” The difficulty encountered in that case was that there were neither findings nor concessions that enabled the court to deal with it intelligently. That state of affairs does not arise here. The commissioners provided by the decree to ascertain the identity of the freedmen entitled to share were required to accept what was known as the authenticated Cherokee roll; and to ascertain who of said persons named in that roll were alive and what descendants of said persons were alive on May 3, 1894, and no evidence was to be accepted by the commissioners to disprove the citizenship of any of the persons whose names appeared upon the authenticated roll. This authenticated roll was taken in 1880 by the Cherokee Nation and given to Wallace when he was making his roll. The Wallace roll was made in 1883 for the distribution of $15,000 appropriated directly to the freedmen by Congress. The first decree passed in this case by this court adopted the Wallace roll, but that decree was set aside and resulted in another decree duly entered February 3, 1896, from which sprang the Kern-Clifton roll. (Whitmire, Trustee, v. Cherokee Nation, 30 C. Cls. E.)
*466 It will thus be seen that the basis for making up "the Kem-Clifton roll was the decree of February 3, 1896, as out of it grew the work of the commission which prepared the Kem-Clifton roll. When Congress came to act providing for the partition of the common property among the citizens of the Cherokee Nation per capita, the Dawes Commission was ordered by section 21 of the Curtis Act {supra) in peremptory terms “ to make a roll of Cherokee freedmen in strict compliance with the decree of the Court of Claims rendered the third day of February, 1896.” This act was supplemented by section 27 of the act of July 1, 1902, which further provided that “ such rolls shall in all other respects be made in strict compliance with the provisions of section 21 of the act of Congress approved June 28, 1898 (30 Stat., 495), and the act of Congress approved May 31, 1900 (31 Stat., 221).”
The act of July 1, 1902, provided that only those be enrolled who were citizens on September first, 1902. The Kern-Clifton roll was directed by the previous decree of this court, February 3, 1896, to be- made as of date May 3, 1894. It must be taken as adjudicated that that roll omitted all who had lost their citizenship prior to May 3, 1894. The act of July 1, 1902, was evidently intended to exclude those who had lost their citizenship after May 3, 1894, and before September 1, 1902, for in all other respects the roll was to be made in compliance with the decree of this court.
The court is bound to presume that the Kern-Clifton roll was made in compliance with the decree because it was accepted by all the parties to the litigation and distribution was made under it. Nor does it appear that the Kern-Clifton roll was ever questioned till the supplemental petition was filed herein.
The Cherokee Nation ratified the act of July 1, 1902, which required the Dawes Commission to make up a roll so far as the freedmen were concerned in strict compliance with the provisions of section 21 of the act of 1898. That act we have seen required a roll of Cherokee freedmen in strict accord with the previous decree of this court. And though it may be that Congress have the plenary power to *467 change the methods of determining the question of citizenship, there is nothing to show that a new method was prescribed by which the court can now be governed. It is true that the lists thus prepared, when approved by the Secretary of the Interior, constituted the final roll upon which allotments and distributions were to be made, but it also appears in the record that in making the roll of freedmen the Dawes Commission omitted some of the freedmen who had forfeited or abjured their citizenship before the decree as well as some of those who had forfeited or abjured their citizenship since 1880. Thus, it is established that the injunction placed upon both defendants by the decree of this court as well as by the Curtis Act of 1898 and the act of July 1, 1902, has been disregarded so far as freedmen are concerned. New rolls have been prepared from original testimony, which include persons not on the court’s roll, and exclude persons on the roll made by the Secretary of the Interior under the court’s direction. Under these circumstances, this court has the power to inquire whether the decree of February 3, 1896 — confirmed by the acts of 1898 and of 1902 {sufra) — has been rightly executed unless there be something in the act of April 26, 1906 (34 Stat., 137), which prevents the court’s interposition.
Section 2 of the last act provided for the completion of the rolls of the tribes affected on or before March 4, 1907. Section 3 of said act provided that the roll of Cherokee freedmen should include only such persons of African descent, either free colored or the slaves of Cherokee citizens and their descendants, who were actual personal bona fide residents of the Cherokee Nation August 11, 1866, or who actually returned and established such residence in the Cherokee Nation on or before February 11, 1867. This provision, it was further provided, was not to prevent the enrollment of any person who theretofore had made application to- the Dawes Commission and who had been adjudged entitled to enrollment by the Secretary of the Interior. There is nothing in this act apparently to prevent the court from proceeding.
*468 No additional rights have been conferred on the freedmen since the jurisdictional act of October 1, 1890, which culminated in the decree of this court February 8, 1896. The act conferring the jurisdiction empowered the freedmen acting as a body through a trustee to bring this suit. Jurisdiction of the body and their trustee was conferred upon this court to ascertain and define their rights. None of these people could therefore proceed by mandamus in another court in view of the rights already secured to them by the decree here and in view of the fact that no hew rights have been given to the 'freedmen as a class since the original act conferring jurisdiction.
Though the court is reluctant to interfere on account of the complications created by the various methods resorted to in making up different rolls and having them approved, there seems to be no alternative left to the court but to investigate the matter, not alone for the persons who allege discrim-inations, but likewise for the benefit of the Cherokee Nation. It reasonably appears that the roll under which distribution is now sought to be made was not made in compliance with the decree because that roll has omitted .persons who were on the Kern-Clifton roll and specifically on the roll of 1880 without finding that they had abjured citizenship after their names had been put on these rolls. In construing the decree and the proceedings under it the court will not now say how far the acquiescence of the Cherokee Nation to the original enrollment operated as an estoppel upon the tribe or whether there be any estoppel at all. Nor will the court, now enter into the questions of fact involved in the alleged forfeiture of rights by those said to have abjured their citizenship. This, with all questions pertaining to the class of freedmen described in the original decree of the court and whom the Congress were so careful to have protected according to the terms of that decree, must depend for any future action to be taken upon the proofs to be presented by the respective parties. Meantime the appointment of the new trustee' for the supplemental proceedings is confirmed.