Weldon, J.,
delivered the opinion of the court:
In order to judicially determine the claim of certain Indians against the United States, Congress in the year 1890 passed an act entitled “An act to ascertain the amount due the Pottawatomie Indians of Michigan and Indiana,” as follows:
Whereas representatives of the Pottawatomie Indians of Michigan and Indiana, in behalf of all the Pottawatomie In *410 dians of said States, make claim against tbe United States on account of various treaty provisions which it is alleged have not been complied with: Therefore,
uBe it enacted, by the Senate and House of Representatives of the United States of America in Congress assembled, That the Court of Claims is hereby authorized to take jurisdiction of and try all questions of difference arising out of treaty stipulations with the said Pottawatomie Indians of Michigan and Indiana, and to render judgment thereon; power is hereby granted the said court to review the entire question of difference de novo, and it shall not be estopped by the joint resolution of Congress approved twenty-eighth July, eighteen hundred and sixty-six, entitled ‘‘Joint resolution for the relief of certain Chipx>ewa, Ottawa, and Pottawatomie Indians,” nor by the receipt in full . given by said Pottawatomies under the provisions of said resolution, nor shall said receipt be evidence of any fact except of payment of the amount of money mentioned in it; 'and the Attorney-General is hereby directed to appear in behalf of the Government, and if the said court shall decide against the United States, the Attorney-General may, within thirty days from the rendition of the judgment, appeal the cause to the Supreme Court of the United States; and from any judgment that may be rendered the said Pottawatomie Indians may also appeal to said Supreme Court: Provided, That the appeal of said Pottawatomie Indians shall be taken within sixty days after the rendition of said judgment, and the said courts shall give such cause precedence.
“Seo. 2. That said action shall be commenced by a petition stating the facts on which said Pottawatomie Indians claim to recover and the amount of their claims, and said petition may be verified by a member of any “Business Committee” or authorized attorney of said Indians as to the existence of such facts, and no other statement need be contained in said petition or verification.
“Approved March 19, 1890.”
On the 14th of April, 1890, a petition was filed in case No. 10743 in behalf of the Pottawatomie Indians by Mr. John Critcher; and as it is alleged “the authorized attorney of said Indians, as appears by agreement between said Critcher and the ‘business committee7 of said Indians dated September 29, 1887.” On the 5th day of November, 1890, another petition was filed in the name of Phineas Pam-to-pee and 1,371 other Pottawatomie Indians of Michigan and Indiana in case No. 16842. The last petition was filed by Mr. John B. Shipman as attorney for petitioners.
On January 8,1891, the defendants made a motion to consolidate the causes; and on January 19,1891, made a motion to *411 dismiss case No. 16842; both of wbicb motions were by order of tbe court reserved to be decided on tbe trial of tbe cases, wbicb were ordered to be tried together. It is insisted by tbe counsel for tbe Government tbat under tbe act of our jurisdiction but one petition can be filed, and tbat, wben case No. 16743 was brought, tbe power and purpose of tbe statute was exhausted and accomplished. In this jurisdiction tbe substance of proceedings rathér than tbe form is tbe material consideration; and tbe object wbicb Congress bad in tbe passage of tbe law will be accomplished if possible.
About tbe year 1830 tbe Government adopted tbe policy of extinguishing by purchase all tbe Indian title to lands east of the Mississippi, and in pursuance of tbat policy, on the 26th and 27th of September, 1833, entered into two treaties with tbe united nation of Chippewa, Ottawa, and Pottawatomie Indians, by virtue of wbicb tbe United States purchased from said united nation 5,000,000 acres of land on the western shore of Lake Michigan, besides three reservations in tbe southern part of tbe then Territory of Michigan (7 Stat. L., 442). One of tbe conditions of tbe purchase was tbat tbe said united nation should within three years'remove to a tract of country west of tbe Mississippi, to be assigned to them by tbe President, to be not less than 5,000,000 acres.
To tbe treaty executed on tbe 27th of September, which was and is supplementary to tbe treaty of tbe 26th, there is attached tbe following provision: “On behalf of tbe chiefs and headmen of tbe united nation of Indians who signed tbe treaty to wbicb these articles are supplementary, we hereby, in evidence of concurrence therein, become parties thereto. And as since tbe signing of tbe treaty a part of tbe band residing on tbe reservations in tbe Territory of Michigan baye requested, on account .of their religious creed, permission to remove to tbe northern part of tbe peninsula of Michigan, it is agreed tbat in case of such removal tbe just proportion of all annuities payable to them under former treaties and tbat arising from tbe sale of tbe reservation on wbicb they now reside shall be paid to-them at L’Arbre Oroche.” (7 Stat. L., 442, 445.)
This supplemental clause to tbe treaty of tbe 27th of September, 1833, has been, and is now, tbe source of tbe contention and difference between tbe defendants and tbat portion of tbe united nation wbicb did not emigrate beyond tbe Missis *412 sippi Piver with the Pottawatomie tribe. Under the terms of this supplement a portion severed its connection with the united nation, and thereby lost its identity with the Potta-watomies as a tribe, in order that it might avail itself of the privilege of remaining in the Territory of Michigan. In ceasing to be a part of the united nation, it did not retain any part of the political or corporate power of the tribe, that was undivided and still inherent in the body which emigrated beyond the Mississippi pursuant to the terms and requirements of the treaty. The portion remaining may have acquired a right to share in the annuities, but the corporate power of the tribe remained intact and incident to the larger body which emigrated.
The reservation spoken of in the treaty consisted of 164 sections, and was situated in the southern portion of Michigan, not far from the State line of Indiana. In case No. 16743 the petition assumes to represent 91 Indians, who are the representatives, as it is alleged, of a part of the band residing on the reservations in the Territory of Michigan; the petition in No. 16842 assumes to represent 1,371 Indians, who are alleged to be a part of the united nation occupying the reservations ceded by the supplementary treaty of September 27,1833, and which were and are included in the exception (as to removal) of the supplemental article of the treaty of September 27.
It is contended by counsel in No. 16743 that the petitioners in No. 16842 have no rights under the treaties of 1833, and therefore no legal capacity to appear by independent or supplemental petition; and that whatever judgment is recovered must be for the benefit of the 91 persons and those they represent, to the exclusion of any claim upon the part of the individuals represented in case No. 16842. The petitioners in the latter case concede the right of the parties in case No. 16743 to bring the suit and have their claims adjudicated, but insist upon an equal right of investigation and determination.
The preamble to the special law of jurisdiction recites: “Whereas representatives of the Pottawatomie Indians of Michigan and Indiana, in behalf of all the Pottawatomies of said States, make claim against the United States on account of various treaty provisions which it is alleged have not been complied with: Therefore, Beit enacted, That the Court of Claims is hereby authorized to take jurisdiction of and try all ques *413 tions of difference arising out of treaty stipulations with the said Pottawatomie Indians of Michigan and Indiana.” The right to sue in some form is given to “ all the Pottawatomie Indians” of Michigan and Indiana, and the plantiffs or petitioners in such a suit are subject only to the qualification or limitation of being Pottawatomie Indians of Michigan and Indiana. The qualification is well defined, and the right extends to all having that qualification. Some of the persons directly represented in the first petition are descendants of persons who belonged to a particular branch of the united nation, and some of the persons named in the second petition are descendants of other persons who belonged to the same band or other bands of Pottawatomies.
In the legislation of our jurisdiction, Congress, have recognized the fact and condition, that representatives of the Pottawatomie Indians of Michigan and Indiana, in behalf of all the Pottawatomies of said States, make claim against the United States on account of various treaty provisions, and upon that fact and condition have provided a jurisdiction in this court, to determine all questions of difference between the United States and said Indians. The purpose of the statute is to settle in an authoritative and judicial form all questions of difference arising from the claim of Pottawatomie Indians of Michigan and Indiana, and any proceeding which accomplishes that purpose, irrespective of technical rules of pleading, is proper and legal under the law of our jurisdiction.
The second section provides that said action shall be commenced by petition stating the facts, and that the same may be verified by a “business committee” or authorized attorney of said Indians. Both of the petitions in this proceeding are verified by the affidavit of the attorney appearing in each case, and in that particular are identical. In each case it appears that by special' appointment the attorneys represent some of the Pottawatomies who remained in the State of Indiana and Michigan under the supplemental article to the treaty of 27th of September, 1833. In this view of the statute the court allows the motion of the defendants to consolidate the cases, made on the 8th day of January, 1891, and overrules the motion to dismiss cause No. 16842, made on the 19th January, 1891.
This brings the issue by both petitions to the consideration *414 of tbe court, to be disposed of upon tbe broad ground of tbe right of all tbe Pottawatomies of Michigan and Indiana. Congress have recognized by tbe very title of tbe act a claimant designated as tbe “ Pottawatomie Indians of Michigan and Indiana,” and under that generic bead is to be determined tbe aggreg-te right of such claimant, leaving tbe question of distribution to that Department of tbe Government, which by law has incumbent on it tbe administration of tbe trust, which in legal contemplation exists between tbe United States and tbe different tribes of Indians. Irrespective of tbe technical question of who has tbe right to maintain a suit under tbe statute, whatever claim any or all of tbe Indians may have against tbe defendants grows out of tbe alleged supplemental article to tbe treaty of 27th September, 1833. If this is tbe law, it is a recognition on tbe part of tbe defendants of a separate and independent right of a part of tbe united nation of Chippewa, Ottawa, and Pottawatomie Indians to a division of and a participation in a portion of tbe fund belonging to tbe whole nation. It is insisted by counsel for tbe defendants that said article is no part in law of the treaty of 1833, that it is not binding on tbe United States, that it is unilateral in form, being unsigned by tbe commissioners, and that it is not a part of tbe treaty of tbe 27th, which it purports to be.
Upon examination of tbe seventh volume of “United States Statutes at Large,” page 445, entitled tbe Indian Treaties, we find said supplemental article attached to tbe supplementary articles of tbe 27th of September, 1833, being supplementary to tbe treaty of tbe 26th of September, 1833. Tbe volume of Indian Treaties was published by authority of Congress in tbe year 1861, and tbe rights of tbe United States in tbe stereotype plates is recognized according to tbe provisions of tbe joint resolution of Congress passed on tbe 3d day of March, 1845; said article has been recognized and acted upon by tbe executive department of tbe Government since tbe year 1833; it was proclaimed by tbe President as a part of tbe treaty when tbe treaty was promulgated, and its binding force is recognized by tbe provisions of tbe law of our jurisdiction, because without it tbe claimant would have no standing in the court.
Tbe fact that tbe commissioners did not sign it, does not invalidate it as a subsisting and binding obligation, as tbe con *415 stitutional right of the President to make a treaty with the concurrence of the Senate does not depend upon the action of the commissioners designated to negotiate with the other contracting party.
It is insisted upon the part of counsel for the defendants that the removal of the Indians was a condition precedent to their right to participate in the general fund of the united nation recognized by the treaties of the 26th and 27th days of September, 1833.
That can not now be considered as an original question. The Government, by its agents, laws, and resolutions of Congress, has treated the removal and continued residence in the northern peninsula of Michigan as immaterial, and it is now too late to attempt to ingraft upon the right of the Indians, a removal and continued residence as a condition precedent to their right to participate in the funds arising from the various treaties made with the united nation.
The litigation arises from the provisions of the statute giving this court jurisdiction as applied to the various treaties made between the defendants and the Indian tribes, which constituted in law and fact the representatives of the claimants from the year 1795 to 1836, at which time the main body of the Indians removed west of the Mississippi, leaving the claimants in the States of Michigan and Indiana, under the supplemental "article of the treaty of the 27th of September, 1833, already quoted. These suits were brought to recover the alleged share of claimants to annuities secured to them under said treaties.
The consolidated ■ record represents two claimants, each insisting upon a very different result and liability against the defendants. The petition in No. 16743 claims as the balance due from the United States the sum of $223,035.46 as the just proportion of the Pottawatomie Indians of Michigan and Indiana under the supplementary article^ to the treaty of September 27,1833, while the petition in the case No. 16842 upon like grounds claims the sum of $963,058.50 as due the entire body, $804,383.80 of which it is alleged belongs to the petitioners represented in said case. It is rather strange that two claimants, predicating their rights upon substantially the same legal grounds, should differ so materially upon the details of the demand and the aggregate liability of the defendants. The petitioners in case No. 16842 reduce in their request the amount *416 of tbeir claim to $728,907.94, which leaves a difference between them and the claimants in No. 16743 of more than $500,000.
The difference in the demands arises from the fact that, in No. 16743 the proportion of the fund dne at and from the making of the treaty in 1833 is based upon a ratio of less than 300 to about 4,000, while in No. 16842 it is based on a ratio of nearly 1,200 to about 4,000. The subject-matter of this claim has been a source of contention between the claimants in 16743 and the defendants since 1836, that being the time when under the treaty of 1833 the Pottawatomies were to emigrate to lands west of the Mississippi. The claim has been before Congress at many sessions and the subject of investigation and statement in the Indian Department at various times.
In 1866 an appropriation of $39,000 was made in pursuance of a settlement between the claimants in 16743 and the defendants, which sum was paid and accepted by 'them in fulfillment and consummation of that settlement; but the act of our jurisdiction provides that we shall not be estopped by “ The joint resolution for the relief of certain Chippewa, Ottawa, and Pottawatomie Indians, nor by the receipt in full given by said Pottawatomies under the provisions of said resolution, nor shall said receipt be evidence of any fact except the payment of the amount of money mentioned in it.” The $39,000 appropriated and accepted is to operate simply as the payment of that much money on account, leaving the question of differences to be • adjusted upon the merits of the whole claim. There is no dispute as to the amount paid the claimants since 1836. Besides the amount of $39,000 under said resolution, the claimants in 16743 have received the farther sum of $36,162.50, making in the aggregate the sum of $75,162.50.
The claim in 16842 is based upon the contention that the number of Indians remaining on the reservation in the Territory of Michigan at the time of emigration was 1,173 besides those of 16743, and that the fund arising from the different treaties in which the Michigan Indians have a right to participate must be distributed upon that basis.
As has been said, the policy of the defendants in making the treaty of 1833, was to have the Indians emigrate west of the Mississippi, and it would be remarkable indeed, if they agreed to a suplemental and subsidiary article to said treaty, the effect of which would be to permit so many to remain in the *417 The testimony taken in No. 16842 upon the question of the number remaining, coming from the sources it does, is very unreliable as tending to any definite or satisfactory results. The evidence in the cause indicates that the Indians were so very loath to leave the State of Michigan that the Government was compelled to resort to force in order to compel their emigration, and it is not strange that many Indians remained, in violation of their duty to emigrate, who did not come within the exception. The Government officers, commencing with 1843, in the distribution of the annuity of $18,000, after an examination and inquiry satisfactory to themselves, and presumably to do justice between the Indians remaining and those emigrating, ascertained and determined the number as coming within the article giving the right to stay at 253, and for a period of twenty-three years, the defendants distributed the annuity of $1,587.50 and the $39,000 upon a basis ranging in numbers from 204 to 260, the first being in 1843 at 253, and the last being in 1866 at 230. During all of that time the United States, by its officers and agents, proceeded in the belief that those numbers represented the class which was to participate in the annuity fund without being compelled to remove beyond the Mississippi with the main body of the nation, and the claim now made in 16842 for more than 1,400 first assumed definite form when the statute of our jurisdiction was passed.
This claim as embraced in case No. 16743 has been before Congress, and reports of different committees have reached different results, but Congress and the Departments have in all their investigations assumed the number of Indians remaining under the clause of the treaty entitling them to remain at substantially the number claimed by the petitioners in 16743. There being no dispute as to the amount paid by the Government, and it being expressly provided that the $39,000 paid under the joint resolution shall be paid on account only, the liability of the defendants is settled by the ratio of the Indians remaining to those emigrating.
In finding vm will be found a table, which gives the relative number for a period of thirty-six years, antedating the time of the table in finding vn, and on which the $1,587.50 was distributed, and covering a period of six years later than the table, in finding vii. By reference to these findings it will *418 be seen that they only differ slightly in the persons r emainin g, but th ey differ sub stai i ti ally in th e numb er of Indians removing. That, table (in finding vm) was prepared by the officers of the Department, and it seems to have been recognized in such a way as that it becomes to the court the most reliable data on which to predicate a finding of the relative proportion of those emigrating and those remaining. The average extending through the thirty-six years is as 291 is to 2,812.
In the preliminary opinion the question whether, under the additional article to the supplementary articles of September 27, 1833, to the treaty of September 26, 1833, the $38,000 passed in solido to the petitioners or only “ a just proportion” of the same, was not decided. It was reserved for the final determination of the court, upon the coming in of the statement of the account upon, the ratio indicated in the preliminary statement.
The clause to the sui>plementary articles, from which the rights of the petitioners originate is as follows : “It is agreed that in case of such removal the just proportion of all annuities payable to them under former treaties and that arising from the sale of the reservation on which they now reside shall be paid to them at L’Arbre Croché.” (7 Stat. L., 445, entitled “ Indian Treaties.”)
Both classes of claimants insist that the proper construction of said article is, that the petitioners are entitled to recover in this proceeding the gross sum of said annuity, and not “ a just proportion.” The counsel for the Government insist that it is to be distributed in a just proportion.
This claim of petitioners is not without persuasive construction in their favor. In the report of the Committee on Indian Affairs of the Senate of the United States entitled “Senate Report No. 121, Forty-second Congress, second session,” it is said: “The annuity of $1,587.50 paid the Michigan Indians from 1843 to 1865 was regarded by the commissioners as their just proportion of an' annuity of $16,000 pledged by the treaty of 1829 and of the $2,000 made payable annually by the supplementary treaties of September 27,1833:
“ Whereas, in the judgment of your committee as expressed in their construction of this and the several treaties, they are entitled to the entire annuity of $20,000.”
This construction of the rights of the petitioners is concurred in by the report of the Committee on Indian Affairs of *419 September 25,1888, of tbe Fiftieth Congress, first session, Be-port No. 3502.
. The same view of the extent of the rights of the petitioners was taken by the Commissioner of Indian Affairs in his reply of May 12,1890, to the honorable Secretary of the Interior.
The amount of this annuity in gross is claimed and stated at the sum of $38,000, which, upon the construction herein indicated, goes to the exclusive benefit of the petitioners, and is to be added to the sum to which they are entitled. We do not think the words of the article providing in favor of the remaining Indians will bear the construction contended for by the petitioners. They were to have, as we construe the words of the treaty, “ a just proportion ” of the annuities arising from all the treaties provided for in the supplementary articles of the 27th of September, 1833. Those who emigrated under the supplementary articles did not lose their right to participate in the general fund because of the additional clause to said articles. They were not parties to it, and their rights should not be affected by it. To give the whole of the annuity to the remaining Indians would be enlarging the additional article beyond the purpose of its adoption, and in violation of the obvious construction of the language employed in its terms. The remaining Indians simply obtained by the additional article exemption from the obligation of removal and the right to enjoy their share or “ just proportion” of the money arising from the provisions and stipulations of the treaty. For these reasons we are constrained to determine that in this proceeding the petitioners are only entitled to u a just proportion” of the $38,000 provided for in the supplementary articles of September 27,1833.
The account may be stated as follows:
Of the sum of $1,432,800, as shown in finding, the proportion of 291 to 3,103 makes the sum of $134,368.26.
Proportion of the $38,000 annuity (of $2,000), $3,653.60.
Same proportion of annuities $41,626.00, being the amount due claimants from the perpetual annuities of $22,300.
From which deduct the sum paid, $75,162.50.
It is insisted by counsel for the petitioners that in the judgment to be rendered by this court we are to consider perpetual annuities ended, and allow a gross sum for the value of the same. That view was taken by a commitee of Congress, and *420 in legislating upon the subject Congress had complete control of the matter, and might exercise their discretion upon the grounds of public policy. We must follow the statute of our jurisdiction and determine the rights of the parties as it directs and intends. The purpose of the law was to ascertain the state of the account between the parties, and render a judgment for what might be due the petitioners, if anything. It did not intend to precipitate the payment of perpetual obligations, but to ascertain the present state of indebtedness. It is true that we are empowered “ to review the entire question of difference de novo; ” but it does not follow from that provision of the statute, that perpetual annuities are to be treated as consummated obligations. That provision of the statute was evidently intended to destroy the legal effect of the resolutions referred to in the law and the receipt in full which was executed by the petitioners when the $38,000 was paid to them in 1866.
We therefore hold, that permanent annuities did not mature as present obligations by the terms of law under which we are proceeding, and we are not authorized to allow the item of $41,626, representing the perpetual annuity of the just proportion of claimants in the annuity of $22,300. There is no dispute as to the amount paid petitioners. They received the sum of $39,000 under the joint resolution of Congress and the additional sum of $36,162.50, as shown in finding tci.
There is another item in the account and contention of claimants, to wit, the sum of $17,630, as their just proportion of certain omitted payments, as shown infinding ix. Thesum of $134,-368.26 necessarily includes this claim, and as that is an exhibit of the full amount due the claimants under all the treaties, and the fact that there was an omission to pay for the years stated would not increase the amount due the claimant in finding vm, which states the different accruing rights of the Indians who are parties to the various treaties from and through which the claimants derive their title to share under the additional clause to the supplemental- treaty of September 27,1833.'
The case as it existed in the testimony, consisting of oral proof, documents, and reports, and the different results as shown by the conclusions and judgment of the different Departments and committees, made its elements most difficult to *421 adjust upon a basis satisfactory to the requirements of judicial accuracy.
The claimants in No. 17692 insisted upon a claim represented by the asserted rights of more than 1,200 persons as coming within the purpose and intent of the supplemental article to the treaty of September 27,1833.
The Government, from the time its attention through its officers was directed to the rights and interests of the non-emigrating Indians, calculated their numbers at substantially the number which is the basis of the ratio we find in determining the just proportion existing between the emigrating and non-emigrating Indians of the Pottawatomie Nation coming within the supplemental article. Allowing to the Pottawatomie Indians of Michigan and Indiana what they are entitled to under the various treaties after deducting the payments, a judgment of $104,626, as shown in the conclusion of law attached to the findings, will be entered.