The **PRAIRIE BAND OF POTAWATOMI INDIANS**, et al., Appellees,

v.

**UNITED STATES.**

The **CITIZEN BAND OF POTAWATOMI INDIANS**, et al., Appellees,

v.

**UNITED STATES,**

**Hannahville Indian Community et al., Appellants.**
**Appeal No. 2-57.**

United States Court of Claims.
July 16, 1958.

---

1. 28 U.S.C.A. § 2254.

2. 28 U.S.C.A. § 2241(c) (3).

Walter H. Maloney, Washington, D. C., for appellants, Hannahville Indian Community, et al. James N. Beery, Washington, D. C., was on the briefs.

Louis L. Rochmes, Washington, D. C., for appellees, The Citizen Band of Potawatomi Indians, et al. Howard D. Moses, Chicago, Ill., was on the brief.

O. R. McGuire, Washington, D. C., for appellees, The Prairie Band of Potawatomi Indians. Robert Stone Johnson, Topeka, Kan., was on the brief.

Asst. Atty. Gen. Perry W. Morton filed a brief for the United States. Sim T. Carman, Alexandria, Va., was on the brief.

REED, Justice (Retired), sitting by designation, delivered the opinion of the court:

This is an appeal from an order of the Indian Claims Commission, 60 Stat. 1049, 25 U.S.C.A. § 70 et seq. The order entered September 19, 1956, 4 Indian Claims Commission 515, 539, is one dismissing an intervening petition of the Hannahville Indian Community, et al., filed in the there-pending consolidated case of the Prairie and Citizen Bands of Potawatomi Indians, et al., against the United States. The appeal was filed under Section 20(b) of the Indian Claims Commission Act.[1]

On the same day, the Commission entered an interlocutory order, 4 Indian Claims Commn. 460,472, awarding the "Potawatomi Nation, as created by the treaty of June 5, 17, 1846, and as it then existed," $3,290,217.

■■ Although there are still pending in the Commission proceedings for accounting, we think the appeal here is allowable under the above jurisdictional section. The order to dismiss the intervention is completely severed from the main proceeding. The intervenors have no voice in the claim of the Potawatomies against the United States. Their claim was "that they be permitted to participate in any judgment or award granted [the Western Potawatomie] and share equally in the proceeds of such award or judgment"[2]. Finality of adjudication has always been insisted upon in the federal courts before appeals are allowed, but some collateral issues may "become so severed * * * as to permit an appeal."[3] The present appeal is of that type. Like Cohen v. Beneficial Loan Corp., 337 U.S. 541, 545, 69 S.Ct. 1221, 93 L.Ed. 1528, a case of appeal from a ruling of the United States Court of Appeals for the Third Circuit requiring a bond to protect a corporate defendant against costs in a derivative suit against a corporation by a stockholder, this appeal has a "final and irreparable effect on the rights of the parties." The Supreme

---

[1]. "(b) When the final determination of the Commission has been filed with the clerk of said Commission the clerk shall give notice of the filing of such determination to the parties to the proceeding in manner and form as directed by the Commission. At any time within three months from the date of the filing of the determination of the Commission with the clerk either party may appeal from the determination of the Commission to the Court of Claims, which Court shall have exclusive jurisdiction to affirm, modify, or set aside such final determination." 60 Stat. 1054, 25 U.S.C.A. § 70s.

[2]. This case differs from Billie. v. Seminole Indians of Florida, 146 F.Supp. 459, 137 Ct.Cl. 161, where there was not a final order determining a positive legal right of the appellant. There it was sought by appellant to quash petitions on the ground that the movant had title to the land involved in the pending suit. It was there recognized that an order may be final even though it only "finally disposes of a collateral issue." See also Caddo Tribe of Oklahoma v. United States, Ct. Cl., 155 F.Supp. 727, where interlocutory order granted only partial relief.

[3]. Baltimore Contractors v. Bodinger, 348 U.S. 176, 179, 75 S.Ct. 249, 99 L.Ed. 233. See Cobbledick v. United States, 309 U.S. 323, 328, 60 S.Ct. 540, 542, 84 L.Ed. 783.

Court said in the Cohen case, 337 U.S. at page 546, 69 S.Ct. at page 1225:

"But this order of the District Court did not make any step toward final disposition of the merits of the case and will not be merged in final judgment. When that time comes, it will be too late effectively to review the present order and the rights conferred by the statute, if it is applicable, will have been lost, probably irreparably."

We think that is the situation here. This court has passed, sub silentio, upon such a controversy, McGhee v. Creek Nation, 122 Ct.Cl. 380.

In the Cohen case any judgment against the corporation could have been appealed because of an error in not requiring bond, but instead the appeal was allowed before judgment. Here, the Commission could have dismissed the petition for intervention as a matter of discretion. See Allen Calculators v. National Cash Register Co., 322 U.S. 137, 140, 64 S.Ct. 905, 88 L.Ed. 1188. Instead, the Commission made a final determination of intervenor's rights from which a res judicata status of their claim might reasonably follow. See 4 Indian Claims Commn. 537. This we think distinguishes this case from Ex Parte Cutting, 94 U.S. 14, 20, 24 L.Ed. 49. This appeal is distinguished from that in Credits Commutation Co. v. United States, 177 U.S. 311, 314 et seq., 20 S.Ct. 636, 638, 44 L.Ed. 782, because the "legal right to intervene" in that case depended upon a "future possibility," contingent and speculative. Hence there was no standing. The final determination of intervenor's rights brings this appeal more closely to the situation in Pipe Line Co. v. United States, 312 U.S. 502, 506, 61 S.Ct. 666, 85 L.Ed. 975, where there was a judgment that allowed the party attempting intervention to safeguard its private interests. In that situation it was held the right to intervene was not discretionary.

The suit in which appellants' motion to intervene was filed was brought before the Commission by two bands of Potawatomi Indians—the Prairie Band of Kansas and the Citizen Band of Oklahome—in two separate petitions. Both claim their right of action is derived from the fact that they are the sole possessors of the rights of the Potawatomi Nation, reinstated in its national character by the Treaty of Council Bluffs, Iowa, and the Osage River, Kansas, June 5 and 17, 1846, 9 Stat. 853. There is no dispute here as to their rights or their derivation.

These appellee bands in the name of the Potawatomi Nation seek recovery from the United States for the difference between the agreed amounts paid their Nation by the United States under the Western treaty aforesaid and the then value of the Iowa tract of five million acres, acquired under the treaty of Chicago by the United Nation of Chippewa, Ottawa and Potawatomi Indians, September 26 and 27, 1833, 7 Stat. 431, 442, and a treaty concluded at Washington February 11, 1837, 7 Stat. 532, for the Osage River lands. These treaties conveyed Potawatomi lands east of the Mississippi to the United States. The tribes agreed to move west. An interlocutory order adjudging over three million dollars to petitioners has been entered by the Indian Claims Commission, as above indicated, for the Potawatomi Nation on the ground that the amounts paid in 1846 were grossly unconscionable in relation to the then value of the land. 4 Indian Claims Commn., Pt. 2, p. 471. The appellants sought intervention which was denied. Appellants are descendants of Potawatomi Indians who occupied lands in Wisconsin, Illinois and Michigan ceded to the United States under the above two treaties. Their ancestors thereby acquired a right to go to one or the other tracts of land west of the Mississippi.

Appellants' contentions are, first, that the various tribes or bands of Potawatomies in the early nineteenth century constituted an "overall political entity" owning all tribal property "including the lands ceded" by the two above treaties and therefore, whether "affiliated," i. e.,

members of the present Potawatomi Nation, or not, or whether organized into a tribe or not, appellants are entitled to a proportionate share of any award from the Commission. Second, appellants say that Congress has recognized their right by certain appropriation acts for the relief of Potawatomi Indians. This recognition is said to be conclusive in any distribution of tribal assets.

As to the first contention, in our view of the controlling facts in this case as to membership, it is immaterial whether the Potawatomies in the East were a single tribe or many bands. Appellants' rights would be the same. The treaties were made under many different names, usually geographic or descriptive in form as in the Greeneville, Ohio, treaty of 1795, Potawatomies of the River Saint Joseph. 7 Stat. 49. See the list of Land Cession Treaties in the reports of the Indian Claims Commission, Vol. 4, Pt. 2, p. 512. The very treaties following the Chicago Treaty of 1833 show that the "United Nation of Chippewa, Ottawa and Potawatomie" could not pass title as we know it, to all Potawatomi land.[4] The question of the autonomy of the various bands of Potawatomi who roamed Ohio, Michigan, Indiana, Illinois and Wisconsin in the early years of the last century was fully examined and determined by the Indian Claims Commission, Vol. 4, Pt. 2, pp. 517–524. They reached this conclusion:

"The above transactions with Potawatomi Indians show beyond doubt that the Potawatomi people, at the time of the treaty of 1833 and the treaty of 1837, was composed of numerous autonomous groups who in their land dealings with defendant acted independently of each other and as autonomous entities."

We agree with that conclusion from the facts found.

We therefore first discuss the question of recognition by Congress of the rights of the intervenors and then the question of continuing membership of intervenors in the Potawatomi Nation after its removal to the West.

■ *Was there determination by the United States of the claims of the Eastern Potawatomi Indians by appropriations to them?* Appellants argue that certain appropriations for the benefit of the Potawatomi of Wisconsin evidenced a recognition by the Congress of the right of all Potawatomi, whether or not they emigrated west, to share in the proceeds of the Iowa and Kansas lands. Their point is that since Congress has power to determine who are members of a tribe entitled to receive the funds or lands of a tribe, congressional appropriations, under the circumstances of the payments now to be discussed, must be accepted here as a determination of appellants' right to share in this award. We accept as sound the stated rule that the United States may make such determinations of property rights.[5] The Commission could find from the record no identifiable group of these Indians who went West and then returned East, nor have we.[6] Therefore we pass only upon claims arising from tribes or persons continuously residing east of the Mississippi.

4. See Treaty of Com-o-za and his Band, December 4, 1834, 7 Stat. 467; Treaty of Logansport, Indiana, December 17, 1834, 7 Stat. 469; Treaty of Turkey Creek Indiana, March 26, 1836, 7 Stat. 490; Treaty of Tippecanoe River, April 11, 1836, 7 Stat. 499; Treaty of Yellow River, Indiana, August 5, 1836, 7 Stat. 505; Treaty of the Pottawatomie Indians of the Wabash, September 23, 1836, 7 Stat. 515.

5. 30 Stat. 90, 25 U.S.C.A. § 184; Stephens v. Cherokee Nation, 174 U.S. 445, 488,

19 S.Ct. 722, 43 L.Ed. 1041; Cherokee Nation v. Hitchcock, 187 U.S. 294, 306, 23 S.Ct. 115, 47 L.Ed. 183; 25 U.S.C.A. § 163. Cohen, Handbook of Federal Indian Law 98. Cf. Roff v. Burney, 168 U.S. 218, 222, 18 S.Ct. 60, 42 L.Ed. 442; Chippewa Indians of Minnesota v. United States, 88 Ct.Cl. 1, 28; 307 U.S. 1, 59 S. Ct. 687, 83 L.Ed. 1067. Cohen, Indian Rights and the Federal Courts, 24 Minn. L.Rev. 145, 160 et seq.

6. Indian Claims Comm., Vol. 4, Pt. 2, p. 529.

**144**

Appellants' claim of recognition is based on several enactments. The Act of June 25, 1864, 13 Stat. 169; of June 21, 1906, 34 Stat. 380; and of June 30, 1913, 38 Stat. 102. The 1864 Act, so far as pertinent, is an appropriation "for fulfilling treaty obligations" of the United States to the Potawatomies arising from various treaties with different tribes from August 3, 1795, through September 26, 1833. It was a general appropriation act for many tribes. The Potawatomies were not subdivided into groups or tribes except that provision was made separately for the Potawatomies of the Huron. A proviso, 13 Stat. 172, is revealing of the then attitude of the Government towards the non-migrant Potawatomies. It reads:

"That the proportion of annuities to which said stray bands of Pottowatomies and Winnebagoes would be entitled if they were settled upon their reservations with their respective tribes shall be retained in the treasury to their credit, from year to year, to be paid to them when they shall unite with their said tribes, or to be used by the Secretary of the Interior in defraying the expenses of their removal, or in settling and subsisting them on any other reservation which may hereafter be provided for them."

Such language indicates rather a requirement of tribal integration west of the Mississippi. Apparently this was not carried out. H.R.Doc. No. 830, 60th Cong., 1st Sess., p. 3.

Evidently the Wisconsin Potawatomies did not go West or receive any part of the annuities payable to any Potawatomies between 1833 and 1903. In 1903 the Potawatomi Indians of Wisconsin filed a Memorial. S.Doc. No. 185, 57th Cong., 2d Sess. It asked consideration of their claims for their proportionate share of tribal annuities and interest on trust funds of the Potawatomi Nation. Their claims had been denied by the Department of the Interior. Before the Department they claimed rights under the treaty of September 26, 1833, at Chicago, 7 Stat. 431. They did not claim under the Articles Supplementary, p. 442, or the exception, p. 445, for certain Indians because "of their religious creed." The Commissioner refused consideration in these words:

"As a matter of fact, the Wisconsin Potawatomies have no claim under the treaty of 1833. They give as an excuse for not complying with the stipulations thereof that the making of the treaty was by a few and not understood by the majority, and many refused to remove and thereby forfeited their rights. There is nothing this office can do in the matter." S.Doc. No. 185, supra, p. 2.

In 1906, 34 Stat. 325, 380, the Congress enacted the following paragraph in the act for contingent expenses of the Indian Department:

"That the Secretary of the Interior be, and he is hereby, directed to cause an investigation to be made of the claims of the Pottawatomie Indians of Wisconsin, as set forth in their memorial to Congress, printed in Senate Document Numbered One hundred and eighty-five, Fifty-seventh Congress, second session, and to report thereon to Congress at the beginning of the next session thereof, showing on the best information now obtainable what number of said Indians continued to reside in the State of Wisconsin after the treaty of September twenty-sixth, eighteen hundred and thirty-three, their proportionate shares of the annuities, trust funds, and other moneys paid to or expended for the tribe to which they belong, in which the claimant Indians have not shared, the amount of such moneys retained in the Treasury of the United States to the credit of the claimant Indians as directed by the provision of the Act of Congress approved June twenty-fifth, eighteen hundred and sixty-four; if none have been so retained

the amount that should have been annually so retained under said law, showing also what disposition has been made of the annuities, trust funds, and other moneys of said tribe, with the amounts and the status of any now remaining to their credit in the Treasury or otherwise. He will also cause an enrollment to be made of said Pottawatomie Indians."

In response to that direction, Secretary Garfield, on April 1, 1908, filed the requested report. H.R.Doc. No. 830, 60th Cong., 1st Sess. In that detailed report it was determined that the proportionate shares of the Potawatomies of Wisconsin in the annuities, trust funds, and other moneys expended for the tribe and not shared in by them, was $1,964,565.87. This was to 1907. The sum included a proportion of the trust income from the receipts of the sale of the Iowa and Kansas lands involved in this present case. The direction did not require nor did the Secretary make a determination as to the validity of the claims.

Some years later the Congress made a determination of the shares of the Wisconsin Indians, as distinct from the descendants of the same band in Canada and the West in these words:

"For the purchase of allotments for the individual members of that portion of the Wisconsin Band of Potawatomie Indians now residing in the States of Wisconsin and Michigan, $150,000, said sum to be reimbursed to the United States out of the appropriation, when made, of $447,339, the said sum last named being the proportionate share of the said Indians in annuities and moneys of the Pottawatomie Tribe, in which they have not shared, as set forth in House Document Numbered Eight hundred and thirty, Sixtieth Congress, first session, * * *" 38 Stat. 102.

Appropriations and hearings continued with references to the claims of the Wisconsin Potawatomies. At the hearings on the Indian Appropriation Bill, Mr. Meritt, Assistant Commissioner of Indian Affairs, justified a requested appropriation thus:

"The Chairman. How much money have these Indians in the Treasury?

"Mr. Meritt. They have very little money in the Treasury, but they have a claim against the Government which will ultimately secure the money necessary, and this is simply drawing on that claim." P. 408, House Committee Hearings, 1914–1916.[7]

The final appropriation of the moneys reported as the proportionate part of the above Potawatomi funds, not shared in by the Wisconsin tribe, was made May 29, 1928, 45 Stat. 901, in these words:

"For the Wisconsin Pottawatomie Indians of Wisconsin and Michigan, $6,839, this sum being the unappropriated balance found due said Indians under the treaty of September 27, 1833 (Seventh Statutes at Large, page 442), and the Act of June 25, 1864 (Thirteenth Statutes at Large, page 172); * * *"

This referred, of course, to the Chicago treaty for sale of the Eastern lands. The explanation, Hearings, Second Deficiency Appropriation Bill 1928, 70th Cong., 1st Sess., 317, shows clearly that this was an appropriation to disburse the balance of the $447,339 mentioned in 38 Statutes.

Nothing has been found, in spite of careful search, to show that these appropriations were made because of any determination by representatives of the Government that the nonmigrant Wisconsin Potawatomies had a right to share in the proceeds of the Western lands as a matter of tribal custom or

---

7. See also similar comments, House Hearings, Indian Appropriations Bill, 1917– 1919, p. 372, December 1917, and p. 340, December 1918.

through the exercise of federal power over the division of tribal funds.

As the Indian Claims Commission points out, Vol. 4, Pt. 2, p. 537, "In none of these acts was the appropriation made a charge against past, existing, or future Potawatomi funds." Had the Congress intended to determine rights, a charge should have been made against future payments to the Western members arising from tribal annuities or trusts.

Reference should be made to the position of the Government before the Indian Commission and on this appeal in regard to the appellants' right of participation in the award. As the Government states in its brief in this court, it has no direct financial interests in the division of any funds ultimately recovered by the Potawatomies in this litigation. By its brief herein, it interprets the action of Congress in these various appropriations to amount to "a clear recognition of their [Hannahville Indian Community, et al.] rights to participate on a per capita basis with the members of the appellee Prairie and Citizen Bands of Potawatomi Indians in all annuities, trust funds, moneys, and all other assets arising out of the Treaty of June 5, 17, 1846, 9 Stat. 853."

The Wisconsin Potawatomies who had not moved West had been a source of difficulty in their neighborhood. In the Act of June 25, 1864 (13 Stat. 161, 172), provision was made for these stray bands. This band continued to need help. 38 Stat. 606. The Western Potawatomies were never brought into a hearing or suit where their rights might be considered. When claimed rights of participation were made by other tribes a more judicial approach was made.[8]

■ We conclude that the Indian Claims Commission correctly held that these appropriations were not and were not intended to be a recognition of a right in the non-emigrant Wisconsin Indians to share in the proceeds of the Western property.

"In essence, the Congressional action was a final disposition of the troublesome problem resulting from the presence of those non-emigrating Indians in the east rather than a recognition of their rights as former members of the migrating bands." Indian Claims Commn., Vol. 4, Pt. 2, p. 538.

*Did membership of the appellants in Potawatomi tribes prior to the 1833 treaties continue thereafter so as to entitle the Eastern Potawatomi to share in the tribal benefits of the 1846 treaty concerning the Iowa and Kansas land?* As our previous comments on the historical background of the Potawatomi Indians show, their tribal organization was uncertain. Some bands that participated in the treaty at Chicago of September 26 and 27, 1833, 7 Stat. 431 and 442, besides the Michigan Band, permitted by the treaties to remove to the northern part of the peninsula of that State, 7 Stat. 445, had members who refused to go to Iowa or Kansas.[9] While it is our opinion that the Potawatomi Indians were divided into numerous bands who acted independently in ceding land to the United States, the existence of non-migrant Indians, members of bands that did join in the exchange for Western lands and who ask now for participation in this recovery, require us to determine whether a descendant of members of those bands, such as the Wis-

8. "The Eastern Band of Cherokee Indians is hereby authorized to institute a suit in the Court of Claims against the United States to determine the rights of the said band in and to the moneys, stocks and bonds, held by the United States in trust for the Cherokee Indians, arising out of the sales of lands lying west of the Mississippi River, and also in a certain other fund, commonly called the permanent annuity fund, to which suit the Cherokee Nation, commonly called the Cherokee Nation West, shall be made a party defendant." 22 Stat. 585.

9. See also treaties with Potawatomi chiefs of Aug. 5 and Sept. 23, 1836, and Feb. 11, 1837, 7 Stat. 505, 515, 532, concerning Kansas land, which was receded to the United States by the Treaty of Council Bluffs, June 5 and 17, 1846, 9 Stat. 853.

consin or Michigan Potawatomi, petitioners here, have rights in this recovery by the Western tribes.[10] That determination will apply also to all the nonemigrant Indians, if all Potawatomies belonged to a single united nation which was the owner by Indian title or federal grant of all lands occupied by Potawatomies. We conclude that they do not have such rights and for these reasons.

At the time of the treaties that conveyed the Eastern lands, the Eastern property was used by the occupants under common rights. This is the manner in which all tribal lands were held. There were exceptions for individuals where some particular sections or a part of a section was patented to them by the United States.[11] Such titles departed from the Indian concept of use of tribal-occupied land. The unbroken rule of law from Johnson v. M'Intosh, 8 Wheat. 543, 5 L.Ed. 681, to date is that Indian title, unrecognized by the United States by treaty or patent, covers the right to use only, a right that may be withdrawn by the Government at any time without liability for compensation.[12] This right to use the land is, however, the property of the band, tribe, or nation of Indians that occupies the land, either by Indian title or a right of occupancy that is recognized by the United States by treaty. The individual's right to use depends upon tribal law or custom. The tribal right to use is communal. No instance is known of individual ownership of tribal lands.[13] Mr. Wallace testified without contradiction in this case that communal use of lands and annuities was a custom of the Potawatomies of all bands.

Since it was only members of the tribe who were entitled to the use and benefit of the tribal property, land or annuities, membership in the tribe is the touchstone to the right of individuals or groups to participate.[14] Appellants' ancestors have been found to have been members of recognized groups of Potawatomies at the time of the treaties of September 26 and 27, 1833, 7 Stat. 431, 442, concerning the Iowa land, and of February 11, 1837, concerning the Kansas land. At that time they were entitled to participate in the annuities and to emigrate with their fellow Potawatomies to the West. The treaties called for this emigration. That of September 26 was in these terms:

10. See Indian Claims Comn., Vol. 4, Pt. 2, pp. 514, 525.

11. See Treaty of Tippecanoe River, October 27, 1832, 7 Stat. 399, 400, where sections, half sections and quarter sections in Indiana were agreed to be patented to various individuals of the Potawatomies of Indiana and Michigan.

12. Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314; United States v. Band of Alcea Tillamooks, 341 U.S. 48, 71 S.Ct. 552, 95 L. Ed. 738. Cf. Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 65 S.Ct. 690, 89 L.Ed. 985.

13. Delaware Indians v. Cherokee Nation, 193 U.S. 127, 137, 24 S.Ct. 342, 48 L. Ed. 646; Sizemore v. Brady, 235 U.S. 441, 442, 35 S.Ct. 135, 59 L.Ed. 308; Cohen, Handbook of Federal Indian Law 185, § 3, Eligibility to Share in Tribal Property. The Cherokee Trust Funds, 117 U.S. 288, 308, 6 S.Ct. 718, 727, 29 L.Ed. 880: "The lands from the sales of which the proceeds were derived belonged to the Cherokee Nation as a political body, and not to its individual members. They were held, it is true, for the common benefit of all the Cherokees, but that does not mean that each member had such an interest, as a tenant in common, that he could claim a *pro rata* proportion of the proceeds of sales made of any part of them. He had a right to use parcels of the lands thus held by the nation, subject to such rules as its governing authority might prescribe; but that right neither prevented nor qualified the legal power of that authority to cede the lands and the title of the nation to the United States. * * * Their treaties of cession must therefore, be held not only to convey the common property of the nation, but to divest the interest therein of each of its members." 26 Op.Atty.Gen. 340, 348; Seminole Nation v. U. S., 90 Ct.Cl. 151; 78 Ct.Cl. 455.

14. Halbert v. United States, 283 U.S. 753, 51 S.Ct. 615, 75 L.Ed. 1389, and cases cited, note 9. See Oakes v. United States, 8 Cir., 172 F. 305, 307, "existing membership."

"And it is further agreed that as fast as the said Indians shall be prepared to emigrate, they shall be removed at the expense of the United States, and shall receive subsistence while upon the journey, and for one year after their arrival at their new homes.—It being understood that the said Indians are to remove from all that part of the land now ceded, which is within the State of Illinois, immediately on the ratification of this treaty, but to be permitted to retain possession of the country north of the boundary line of the said State, for the term of three years, without molestation or interruption and under the protection of the laws of the United States."

Article 3d of the supplementary treaty of September 27 carried like meaning, as did those of August 5, September 23, 1836, and February 11, 1837, 7 Stat. 505, 515, 532. When the agreement was reached, 7 Stat. 445, for some to remain in the East, they were granted the annuities that arose from the sale of the Eastern lands but nothing more. We hold, however, that continued membership in the tribe permits participation in distribution of the Western assets. Loss of membership in the tribe brings a loss of rights in the tribal community property and of participation in the proceeds of any subsequent sale, distribution or allotment of tribal property. Loss of membership occurs through absence from the tribe.

This conclusion is reached from consideration of the authority Indian tribes possess over their membership. We have been unable to find, through the Department of the Interior or otherwise, definite provisions as to membership in the Constitution or By-Laws of either the Citizen or Prairie Bands of Potawatomi.[15] Nor is there a showing of the requirement of membership of the United Nation of 1846, 7 Stat., or any of the Eastern tribes of the nineteenth century.

This result is supported by the case of the Cherokee Trust Funds, 117 U.S. 288, 6 S.Ct. 718, 29 L.Ed. 880. The Cherokees originally occupied the present Southeastern States. They were recognized as one people. At page 295 of 117 U.S., at page 720, of 6 S.Ct. By treaty of July 8, 1817, 7 Stat. 156, the tribe separated into two bands, one west of the Mississippi, the other east. By this treaty the United States acquired Cherokee lands east of the Mississippi, near white settlements, and the Indians lands in the West. This arrangement did not solve their problems. It was supplemented first by Articles of Convention in 1828, 7 Stat. 311, and Articles of Agreement and Convention of February 14, 1833, 7 Stat. 414. These agreements gave the Cherokees seven million acres of western lands and in addition free range westward "as far west as the sovereignty of the United States and

---

15. The Constitution and By-Laws of the Citizen Band of Potawatomi Indians of Oklahoma, approved October 17, 1938, by Harry Slattery, Acting Secretary of the Interior, reads as follows:

"Article II—Membership of Tribe

"Section 1. The membership of the Citizen Band of Potawatomi Indians of Oklahoma shall consist of the following persons:

"(a) All persons of Indian blood who were bona fide members of the Citizen Band of Potawatomi Indians and who were enrolled or were entitled to be enrolled on the official census roll of the Band as of January 1, 1937.

"(b) All children of Indian blood born since the date of said roll, both of whose parents are members of the Tribe.

"(c) Any child of Indian blood born of a marriage between a member of the Citizen Band of Potawatomi Indians and a nonmember thereof who chooses to affiliate with the Citizen Band of Potawatomi Indians.

"Sec. 2. The Council shall have power to prescribe rules and regulations, subject to the approval of the Secretary of the Interior, covering future membership including adoptions and the loss of membership."

No constitution or by-laws of the Prairie Band of Kansas have been found. A draft of the proposed organization of the Tribal Advisory Committee, approved June 16, 1932, by C. J. Rhoads, Commissioner, does not mention membership.

their right of soil extend." Difficulties continued, resulting in the Treaty of New Echota in 1835, 7 Stat. 478. By this arrangement the Nation was re-united west of the Mississippi, and settled upon the vast tract of public land acquired by the 1833 treaty. Article I of the New Echota Treaty had this provision:

"The Cherokee nation hereby cede relinquish and convey to the United States all the lands owned claimed or possessed by them east of the Mississippi river, * * *"

Article 16 provided:

"It is hereby stipulated and agreed by the Cherokees that they shall remove to their new homes within two years from the ratification of this treaty. * * *"

Money from the sales of portions of these Western lands resulted in the creation of trusts for the Cherokee. 117 U.S. 308, 6 S.Ct. 727, 29 L.Ed. 880.

However, when the Cherokees removed West, there remained east of the Mississippi certain members of the Cherokee Nation. They organized themselves as the Eastern Band of Cherokees and brought suit, under congressional authority, against the United States and the Cherokee Nation for a share of the proceeds of certain lands and annuities, derived by the Nation from its Western lands. Eastern Band of Cherokees v. United States and the Cherokee Nation, 20 Ct.Cl. 449. While the Cherokee Nation had a constitution which declared,

"That whenever any of such citizen or citizens shall remove, with their effects, out of the limits of this nation, and become citizens of any other government, all their rights and privileges as citizens of this nation shall cease,"

at page 482, this was understood to be the "common law of all Indian tribes and nations." Page 481. The Court of Claims held, at page 483:

"If the Indians east of the Mississippi River wish to enjoy the common benefits of the common property of the nation, in whatever form it may be, whether in permanent fund or in the proceeds of the sale of common lands, they must comply with its constitution and laws and become readmitted to citizenship as therein provided."

The Supreme Court upheld this determination, saying:

"The claim now presented by the Cherokees of North Carolina to a share of the commuted annuity fund of $214,000, and of the fund created by sales of lands west of the Mississippi ceded to the Cherokee nation, resting, as it does, upon the designation in the treaties of the lands originally possessed by the Cherokees, and ceded to the United States, or subsequently acquired by them from the United States, as 'the common property of the nation,' or as held for the 'common use and benefit' of the Cherokee people, has no substantial foundation. If Indians in that state, or in any other state east of the Mississippi, wish to enjoy the benefits of the common property of the Cherokee nation, in whatever form it may exist, they must, as held by the court of claims, comply with the constitution and laws of the Cherokee nation, and be readmitted to citizenship as there provided. They cannot live out of its territory, evade the obligations and burdens of citizenship, and at the same time enjoy the benefits of the funds and common property of the nation. Those funds and that property were dedicated by the constitution of the Cherokees, and were intended by the treaties with the United States, for the benefit of the united nation, and not in any respect for those who had separated from it, and become aliens to their nation." 117 U.S., at pages 311–312, 6 S.Ct. at page 728.

On the other hand, the Supreme Court upheld this court in United States v. Cherokee Nation, 202 U.S. 101, 26 S.Ct. 588, 50 L.Ed. 949, where the Eastern

Cherokees claimed a share in the $5,000,-000 paid the Nation under Article I of the New Echota Treaty for the lands east of the Mississippi by virtue of Article 12 giving them "their due portion of all the personal benefits accruing under this treaty for their claims, improvements and *per capita;* as soon as an appropriation is made for this treaty." 7 Stat. 483. This later decision was based on individual rights acquired by the treaty. They had not lost those rights by loss of membership. The Supreme Court, 202 U.S. at page 128, 26 S. Ct. at page 600, approved verbatim the following holding of this court:

> "As to those Cherokees who remained in Georgia and North Carolina, in Alabama and Tennessee, they owe no allegiance to the Cherokee Nation, and the nation owes no political protection to them. But they, as communal owners of the lands east of the Mississippi, at the time of the treaty of 1835, were equally interested, with the communal owners who were carried to the West, in the $5,000,000 fund which was the consideration of the cession, so far as it was to be distributed *per capita*. The Cherokee Nation was not bound to prosecute their claims against the United States for the unpaid balance of the $5,000,000 fund, but their rights were inextricably interwoven with the rights and equities of the Cherokees who were citizens of the nation, and the nation properly made no distinction when parting with the Outlet, but demanded justice from the Cherokee point of view for all Cherokees who had been wronged by the nonfulfilment of the treaty of New Echota. As to these Eastern nonresident Cherokee aliens the nation acted simply as an attorney collecting a debt. In its hands the moneys would be an implied trust for the benefit of the equitable owners."

A case similar to that of the United States v. Cherokee Nation, 202 U.S. 101, 26 S.Ct. 588, 50 L.Ed. 949, just discussed, arose between descendants of the Creek Indians. That nation or tribe also originally inhabited the eastern part of the United States. By treaties between the United States and the Creek Nation, that Nation's lands east of the Mississippi were ceded to the United States, 7 Stat. 286 and 366, leaving the individual Creeks free to go to the Indian territory with the Nation or to remain in the East. The Creeks who settled by treaty west of the Missisippi formed a new tribal organization. 7 Stat. 417. When later the communal ownership of Indian Territory land seemed inadvisable and allotments were made to individual members of the western Creek Nation, rolls were made of the citizens of the Creek tribe. 27 Stat. 612, 645.[16]

After the establishment of the Indian Claims Commission, the Creek Nation, the political body of the western Creeks, sought redress before the Commission for the acquisition by the United States of eastern Creek lands in the early part of the nineteenth century. The Creek Nation East sought to intervene but the Commission denied that right. On appeal this court reversed that ruling. It was said:

> "The land which is the subject matter of this suit was not land in Oklahoma, nor was it land concerning which the United States dealt exclusively with the Oklahoma Creeks. It was land located east of the Mississippi which was obtained by the United States in 1814 under a treaty with the Creek Nation, all of whose members then lived east of the Mississippi, and whose identity as a tribe and whose ownership of the land ceded had been specifically recognized by the Treaty of August 7, [1790]. If an injury was inflicted by the United States in procuring and enforcing the Treaty of August 9, 1814, it was an injury

---

16. See the Treaty between the United States and the Muscogee or Creek tribe of Indians, 31 Stat. 861.

to the members of the Creek Nation with whom the treaty was negotiated and who owned the land in question, and not merely an injury to the Creek Indians who (or whose heirs) later emigrated to the Indian Territory west of the Mississippi and formed a new and separate tribal organization for the purpose of holding and managing property awarded to them in the west. * * * The maintenance or lack of maintenance of tribal relations and the occurrence or non-occurrence of acts of recognition of a tribal organization of the Creek Indians in Oklahoma or east of the Mississippi, subsequent to 1814, would not affect or change what was done to the Creek Nation of 1814." McGhee v. Creek Nation, 122 Ct.Cl. 387–388.

Another case that indicates the appellants here are not entitled to share in the proceeds of the sale of the Iowa tract of land is Phineas Pam-To-Pee v. United States, 148 U.S. 691, 13 S.Ct. 742, 37 L.Ed. 613. This case involved the Potawatomi Indians of Michigan and Indiana. These Indians had remained in the East after the Treaty of Chicago, September 26, 1833, 7 Stat. 431, and the articles supplementary thereto of September 27, 1833, particularly the addition thereto appearing on page 445. The Indians who had remained in the East

under the provisions of the Supplementary Agreement had become scattered and had not received their "just proportion of all annuities" guaranteed them under the final provision of the supplementary articles appearing in 7 Stat. at page 445.[17]

Congress enacted a measure March 19, 1890, 26 Stat. 24, giving jurisdiction to the Court of Claims to "try all questions of difference arising out of treaty stipulations with the said Pottawatomie Indians of Michigan and Indiana." Without regard to former settlements, it was to review the entire question de novo. Under that authority, two groups of the eastern Potawatomi filed their petition in the Court of Claims; one on April 14, No. 15,095, and the other November 5, 1890, No. 15,103. They sought a settlement of their rights to funds arising under all arrangements and treaties between the Potawatomi and the United States.

Under the earlier petition in the Pam-To-Pee case in the Court of Claims[18] no claim was made for any payments under Articles III and VII of the Treaty of June 5 and 17, 1846, 9 Stat. 853.[19] However, a later petition by different parties, U.S.Sup.Ct., Tr.Rec. 16937, contained a claim under the 1833 treaty to their share of the interest in the balance, $643,000.[20]

---

17. 7 Stat. at page 445:
   "On behalf of the Chiefs and Head men of the United Nation of Indians who signed the treaty to which these articles are supplementary we hereby, in evidence of our concurrence therein, become parties thereto.
   "And, as since the signing of the treaty a part of the band residing on the reservations in the Territory of Michigan, have requested, on account of their religious creed, permission to remove to the northern part of the peninsula of Michigan, it is agreed that in case of such removal the just proportion of all annuities payable to them under former treaties and that arising from the sale of the reservation on which they now reside shall be paid to them at, L'arbre, Croche."

18. U.S.Sup.Ct., Oct. Term 1892, Tr.Rec., vol. 19, p. 16932.

19. Under that treaty, the balance to be invested would have been the $850,000 promised under Article III less the deductions of $87,000 under Article IV, the $50,000 under Article V, and the $70,000 under Article VI, a total of $207,000, which left for investment $643,000.

20. "Fifteenth. Under the said treaty of September 26 and 27, 1833, the petitioners claim their share in the land ceded by the United States to the said United Nation of Indians, consisting of 5,000,000 of acres situate in Iowa, and in the avails thereof promised and assured by articles 3 and 7 of the treaty of June 17, 1846, aforesaid (9 St. at L. 855); that the interest at five per cent. on the said trust fund of $643,000 thereby created was $32,150, payable annually, beginning in 1849; that the total amount thereof to and including the year

In their decision, the Court of Claims, Potawatami Indians v. United States, 27 Ct.Cl. 403, did not discuss this claim to share in the interest from the balance of the $850,000, i. e., $643,000, arising from the treaty of 1846 concerning the Iowa land. The findings of facts, however, ¶ VIII, shows that the only finding of indebtedness of the government to the Potawatomi Indians on account of the Iowa 1846 treaty, was to allow them to share in the $300 annually, a perpetual payment to be made to the Indians under Article X of that treaty.[21] This they were entitled to because the $300 annual obligation had arisen from the 1828 Michigan Potawatomi agreement granting them the tobacco, iron and steel. 7 Stat. 318. The Court of Claims used "the sum of $1,432,800" as the basis for the calculation. 27 Ct.Cl. 419. Examination will show that this is the precise figure of the total appearing in the last table on page 407. This last table is the sum of the two preceeding tables on the same page. Examination will show that only the $300 perpetual annuity, commuted from the 1828 treaty, Article X, figured in the decision. No computation was made of the $643,000 trust, the land sale or other rights under the 1846 treaty. Furthermore, on appeal it was argued in appellants' brief that this was erroneous:

"The decree below is erroneous in this:

"4. In not allowing the claimants a proportion of the proceeds of the 5,000,000 acre reservation west of the Mississippi received in exchange for the one on the west shore of Lake Michigan when it was ceded to the United States by the treaty of June 17, 1846." Pam-To-Pee v. United States, brief for Appellants filed Jan. 3, 1893, U.S. Sup.Ct., p. 10. (File copies of Briefs, U.S.Sup.Ct., 1892 Term, vol. 16, appellants' brief, p. 10.) [148 U.S. 691, 13 S.Ct. 742, 37 L.Ed. 613]

In ¶ 5 the argument was made that the $643,000 above referred to and remaining with the United States in trust for said Indians should be taken into consideration. The appellants in that case pointed out, brief, p. 29, as a recognition by the Congress of their right to share in the western assets, the fact that the sum of $39,000, appropriated by Congress before the suit was brought in the Court of Claims, was paid out of funds of the United States held in trust for the Western Potawatomi Indians.

The Government replied, U. S. brief, p. 14:

"The Indian title was only one of occupancy. The Pottawatomies who went west of the Great River became possessed of that right of occupancy which civilized nations concede to belong to Indian tribes living upon specified lands. Those Indians who by agreement were to remain east, and those who refused to obey and who evaded the efforts of the Government to locate them west, never had any occupancy, or any possession of any kind, and never had anything that can be recognized as an Indian title or right of use, or of occupancy, and had nothing in this connection to sell,

---

1890 is $1,350,300, and the value of the same as an annuity at this date is $343,000, making an aggregate sum of $1,993,300 for the interest and the value of the annuity together. The share of that sum belonging to the claimants, estimated on the basis of the numbers of Indians west and east of the Mississippi as aforesaid *per capita*, is $402.68, and the total of the portion thereof belonging to the claimants, all together, is $446,974.80. The amount of said fund belonging to your petitioners separately, estimated on the same basis, is $346,304.80, and this sum they claim nothing having been paid thereon." U.S.Sup.Ct., Tr.Rec., p. 16946, p. 28 of petition.

21. "Article X. It is agreed that hereafter there shall be paid to the Pottowautomie nation, annually, the sum of three hundred dollars, in lieu of the two thousand pounds of tobacco, fifteen hundred pounds of iron, and three hundred and fifty pounds of steel, stipulated to be paid to the Pottowautomies under the third article of the treaty of September 20, 1828." 9 Stat. at page 855.

and never became possessed of anything whatever, on account of the Western reservation for which they are entitled to payment."

On the appeal in Pam-To-Pee v. United States, 148 U.S. 691, 695, 13 S.Ct. 742, 37 L.Ed. 613, the Supreme Court noted the trust of $643,000 remaining from the $850,000. However, it did not allow the eastern Potawatomies anything under their contention but instead accepted the conclusion of the Court of Claims that omitted any payment by virtue of the trust fund created in 1846. At page 703 of 148 U.S., at page 747 of 13 S.Ct.

Such a conclusion as was reached in the Cherokee Trust Funds case, supra, we think, is compelled by the characteristics of Indian tribal life. Residence on a reservation may not be essential but membership is. Halbert v. United States, 283 U.S. 753, 762, 51 S.Ct. 615, 75 L.Ed. 1389. Death terminates the incidents of tribal membership. Children take in their own right as members.[22] Nothing appears to indicate any change by the Potawatomi of the normal membership requirement of residence with the Nation. In 1861, 12 Stat. 1191, a treaty with the Potawatomi was concluded concerning the Kansas land, received through the Council Bluffs treaty. It provided for allotment of lands in severalty "with power of alienation" to those desiring such power and deemed competent. The balance was to be held in common. Article IV. In 1867, 15 Stat. 531, another treaty provided in Article IV for the removal of those whose desire to do so to Indian Territory on a tract to be there acquired. In that treaty arrangements were made to keep certain lands in common, excepting the Prairie Band, i. e., those remaining in Kansas, from any interest therein.[23] In neither treaty was any provision made for or any consideration given to the non-emigrant Potawatomi of the 1833 treaties. Since these treaties were negotiated by the chiefs and headmen of the United Potawatomi Nation, it seems conclusive that the Nation, who in the absence of congressional action, has the power to determine membership, denied membership to the non-emigrant Potawatomi.

Our review of this record leads to the conclusion reached by the Commission. We think the Commission's findings of fact, material to the conclusions reached by us as to the claims of appellant, are supported by substantial evidence in the record as a whole in accordance with this court's interpretation of the Indian Claims Commission Act in Osage Nations of Indians v. United States, 119 Ct.Cl. 592, 602, and support the Commission's final conclusion that the appellants had dissolved "their connections and their rights to share" in the proceeds of the Western lands before the Treaty of Council Bluffs and Osage River.

The judgment of the Indian Claims Commission dismissing the petition for intervention is affirmed.

---

22. LaRoque v. United States, 239 U.S. 62, 66, 36 S.Ct. 22, 60 L.Ed. 147. Cf. Cherokee Intermarriage Cases, 203 U.S. 76, 86, 27 S.Ct. 29, 33, 51 L.Ed. 96:

"By § 2 of article 1 of the Constitution of 1839 it was provided that 'whenever any citizen shall remove with his effects out of the limits of this Nation, and becomes a citizen of any other government, all his rights and privileges as a citizen of this Nation shall cease; provided, nevertheless, that the National Council shall have power to readmit, by law, to all the rights of citizenship, any such person or persons who may, at any time, desire to return to the Nation, on memorializing the National Council for such readmission.'" 4 Indian Claims Commn., Pt. 2, at 532.

23. 15 Stat. at page 535:

"* * * which amount shall be the common property of the tribe, except the Prairie band, who shall have no interest in said reservation, to be purchased as aforesaid, but in lieu thereof shall receive their pro rata share of the proceeds of the sale of said land in money, as the same may be received: * * *"

**154**

JONES, Chief Judge, and MADDEN, and LITTLETON, Judges, concur.

WHITAKER, Judge, took no part in the consideration and decision of this case.